SHIPLEY *v.* CAMPBELL, EXECUTOR.

5-894 294 S. W. 2d 59

Opinion delivered October 15, 1956.

*Harold Sharpe, Wood & Smith, Wesley Wood* and *Morriss, Morriss, Boatwright & Lewis,* for appellant.

*Mann & McCulloch* and *Giles Dearing,* for appellee.

GEORGE ROSE SMITH, J. This is a contest of the will of Mary Lee Mann, who died in 1953 at the age of seventy-five. Her estate, valued at more than $250,000, consists principally of a large farm in Cross and St. Francis counties. By the will in question, which was executed in 1952, the testatrix made several specific bequests and then left the remainder of her estate to Fred Thomas, who had been her farm manager since 1948. The de-

cedent's heirs at law are fourteen cousins, thirteen of whom are the contestants. The other cousin, Lee Ola Roberts, received a legacy under the will and has not joined in the contest. The trial court, rejecting the contestants' assertions of testamentary incapacity and undue influence, admitted the will to probate.

On the issue of testamentary capacity it is the appellants' contention that Mary Lee Mann became mentally incompetent at some time between 1937 and 1941 and was thereafter continuously insane until her death in 1953. In developing this theory the contestants introduced a great deal of testimony about occurrences long before the making of the will in 1952. The proponents' proof is also extensive in its range, so that the record presents a detailed account of the last sixteen years of Mrs. Mann's life.

Mary Lee Mann was born on the farm now in controversy, but she was orphaned in childhood and was brought up by relatives in Whiteville, Tennessee. She and Arthur Mann were married in 1912 and lived together devotedly until his death in 1941. From about the year 1926 the couple made their home in San Angelo, Texas, where Mann was engaged in business. During her earlier years in Texas Mrs. Mann is described as having been markedly antisocial and apparently interested only in her husband.

In 1937 Mrs. Mann began to show the effects of heart trouble and arteriosclerosis, from which she suffered for the rest of her life. Her weight fell from about 170 pounds to about 115 pounds. The contestants offered much testimony to show that Mrs. Mann became very critical of every one except her husband, extremely careless in her dress, and exceedingly stingy in all money matters. There is also proof that the testatrix was deeply shocked by the unexpected death of her husband in April of 1941. Her grief is portrayed as having been altogether abnormal; it is said that for years she habitually stayed up at night, talking to her husband's picture, and slept during the day.

In the latter part of 1941 Mrs. Mann returned to Whiteville and lived there until 1948. She then moved to Wynne, Arkansas, and bought a house jointly with her cousin and cousin-in-law, Iva and Gary Flowers. The three lived together until March, 1951, but the arrangement did not prove to be a happy one. Mrs. Mann eventually brought suit to cancel the contract and was upheld by the courts. *Flowers* v. *Mann,* 219 Ark. 397, 242 S. W. 2d 840. From March to July of 1951 the testatrix was quite ill and spent the greater part of that period in the clinic at Wynne. When she was able to leave the hospital she moved to the farm and lived with Fred Thomas and his wife until her death on December 15, 1953. The will now in question, which was the last of several wills made by Mrs. Mann, was executed on March 30, 1952, after she had been at the farm for about eight months.

As we have said, the appellants contend that the testatrix was an insane woman, without lucid intervals, for at least the last twelve years of her life. In our opinion the weight of the evidence is against this contention and establishes the existence of testamentary capacity when the will was executed. We find it impossible to reconcile the theory of continuous insanity with the undisputed proof of what Mrs. Mann actually accomplished during the years in question.

Upon her husband's death in 1941 Mrs. Mann acted as the executrix of his will and appears to have performed her duties satisfactorily. She later conveyed her San Angelo home to her sister-in-law, Ona Mann Runkles, who now testifies that Mary Lee was mentally incompetent when she executed that deed.

When Mrs. Mann left Texas she transferred her substantial bank accounts to Arkansas. Here she maintained two bank accounts and made deposits and withdrawals. There are in the record some 300 checks that she wrote between 1941 and November, 1953 — the month before her death. Many represent business transactions, such as the payment of insurance premiums and the semi-monthly salary of her former farm manager. She paid off a mortgage that encumbered the farm at her husband's

death. She required her farm manager to send the tenants' rent notes to her in Whiteville and returned them for collection when the crops were about to be gathered. She invested $25,000 or more in the Wynne Federal Savings and Loan Association after having discussed the matter with her banker and with the president of the association, who says that she first asked "a lot of intelligent questions" about the institution. After moving to Wynne the testatrix contributed about $4,000 for the purchase of a pipe organ for her church at Whiteville.

The record contains a number of letters, in Mrs. Mann's handwriting, that give every indication of having been written by a person of normal intelligence. Before Mrs. Mann went to Wynne to live she wrote to Mrs. Flowers and asked her to find a suitable house. The decedent paid almost the whole consideration for the home that was bought jointly with Mr. and Mrs. Flowers, but they now question her capacity to enter into the agreement. We need not enumerate many other transactions that are described in the testimony.

Strongly confirming Mrs. Mann's soundness of mind is the testimony relating to the actual execution of the will. Her banker, W. W. Campbell, states that he and his wife visited Mrs. Mann about every two months while she was living at the farm. During those visits she seemed alert and cheerful. A week or so before the drafting of the will, as the Campbells were leaving, Mrs. Mann told Campbell that she wanted to talk to him about her will at the first opportunity. On Sunday, March 30, she had Thomas telephone Campbell and ask him to come to the farm. Assuming that the will was to be discussed, Campbell took with him his brother-in-law, Burk Mann, a local attorney. When they arrived Campbell went in alone and found that Mrs. Mann did desire to make a will. He explained that he had brought Burk Mann, and, while this attorney was not related to the testatrix' deceased husband, Arthur Mann, the testatrix knew him by reputation and said there was no one she would rather have. Campbell then called Mann into the house.

Mrs. Mann discussed the proposed will in detail with the attorney. She had already prepared a memorandum of the various bequests, including the devise of the farm to Fred Thomas. Mann went over the memorandum with her, item by item, and, as his client wanted the will drawn at once, went into another room and wrote the will. At Mrs. Mann's suggestion Lee Horton, who lived a few miles away, was called to witness the will, along with Burk Mann. The latter says that he asked the testatrix whether Fred Thomas and his wife had any intimation about what she was doing for them, and she said: "Not the least bit." The memorandum, concededly in Mrs. Mann's handwriting, was introduced in evidence and is one of the most convincing indications of the testatrix' mental capacity.

Although the testimony of the lay witnesses preponderates rather decidedly in favor of the decedent's sanity, the contestants introduced six physicians who expressed the opinion that Mrs. Mann lacked testamentary capacity. Four of these witnesses, however, had never seen the testatrix and based their opinion upon a fifty-page hypothetical question. This question does not contain an impartial summary of all the testimony; it presents the contestants' proof in its most favorable aspect and disregards almost all of the proponents' evidence. In these circumstances the expert opinions do not materially strengthen the contestants' case. On the other hand, the opinions of the physicians who actually treated Mrs. Mann are in conflict.

On the issue of undue influence we are similarly of the opinion that the contestants failed to sustain their burden of proof. There is no direct evidence of undue influence on the part of Fred Thomas and his wife, but the appellants urge that the circumstantial evidence is sufficiently strong to invalidate the will on this ground. They argue that the residuary devise to Thomas, to the exclusion of the testatrix' blood kin, is an unnatural disposition of the estate, and they stress the opportunity that the Thomases had for the exercise of a sinister influence upon Mrs. Mann while she was living with them at the farm.

The testatrix' disposition of her property does not seem as unnatural as the appellants would have us believe. Mrs. Mann's heirs, under the statute of descent and distribution, are fourteen cousins. She was undoubtedly fond of one of them, Mrs. Roberts, who helped rear Mrs. Mann in Whiteville and who receives in excess of $12,000 under the will. The other thirteen live in various places — elsewhere in Tennessee, in Massachusetts, Missouri, Texas, and Arkansas. It is not shown that Mrs. Mann had ever met all these scattered cousins or had any especial affection for them. Three of the thirteen testified at the trial, but none of them had seen the testatrix for more than four years before her death. One of the three had seen Mrs. Mann only three times in her life, for about an hour on each occasion. On the basis of those brief visits the witness says she considered her kinswoman to be of unsound mind, but she gives no plausible reason for this conclusion. Inasmuch as the testatrix undoubtedly had the privilege of leaving her property to any one she chose, her failure to make these contestants the beneficiaries of her will cannot be regarded as strong circumstantial proof of undue influence.

It is certainly true that Mr. and Mrs. Thomas had an excellent opportunity to sway the testatrix during the eight months preceding the execution of the 1952 will. Mrs. Mann was then in frail health, did not venture beyond the front porch, and was dependent upon the Thomases for all her needs. Yet she was not kept in seclusion; she had many business and social visitors while she was living with the Thomases. It is argued, however, that the existence of undue influence is the only reasonable explanation for Mrs. Mann's exceptional generosity toward one who was not related to her and had merely been the manager of her farm for a few years.

This argument is pretty well rebutted by the terms of the next to the last will that the testatrix executed. This will was signed and attested at the Wynne clinic on April 30, 1951. It was prepared by Mrs. Mann's attorney, Giles Dearing, who was representing her in the litigation with Mr. and Mrs. Flowers. There is no good

reason to think that the 1951 will did not correctly reflect the testatrix' wishes at that time.

By the earlier will Mrs. Mann left all her real property to Mrs. Roberts for life, with remainder in fee "to my good friend Fred Thomas." As Mrs. Roberts was then past eighty years of age the remainder to Thomas was very nearly the equivalent of the fee simple. It is significant that the facts now strongly urged to support the charge of undue influence did not exist in April, 1951. Mrs. Mann had not then lived in the same home with the Thomases. To the contrary, for the preceding three years she had resided with her cousin, Iva Flowers. During those years the Thomases took the trouble to visit Mrs. Mann several times a week and to bring gifts of fresh food from the farm. There is proof that Mrs. Mann preferred living with the Thomases to living with her cousin. There is proof that she was happy while in their care. Theirs was perhaps the only real kindness that Mrs. Mann received from anyone after the death of her husband. The fact that her recognition of that kindness may seem to have been unduly liberal is not a sufficient reason for declaring her will to be invalid.

Affirmed.