John D, Bennett, S.
This is a contested probate proceeding in which the special guardian of the unknown heirs filed objec *851 tions to probate upon the grounds of fraud and undue influence and also upon the ground that the testatrix revoked, or attempted to revoke, the instrument offered for probate.
The proceeding was brought on for trial before this court without a jury. The proponent has put in his prima facie case, and the contestant has gone forward with evidence of fraud an undue influence and of attempted revocation. When the contestant rested," the attorney for the proponent moved to dismiss the objections on the ground that the contestant failed to make out a case constituting fraud and undue influence. This motion is now before the court for determination, and both sides have submitted memoranda of law.
Mrs. McLean, the testatrix, was blind, a widow of about 70 years of age, and a person with no known blood relatives. In January of 1956, she again met the proponent, Louis Checola, after a lapse of some 20 to 25 years. The proponent, unrelated to her, took upon himself the cleaning and repairing of the premises where Mrs. McLean lived, and in general tended to the decedent’s needs over a considerable period of time. In late February or early March of 1956, Mrs. McLean and Mr. Checola opened a joint checking account at the Franklin National Bank. On April 20,1956, Mrs. McLean executed the will herein offered for probate, in which Mr. Checola is named as the sole beneficiary. Subsequently on July 2, 1956, Mrs. McLean executed a power of attorney to Mr. Checola.
There is much testimony as to the subsequent acts of the proponent, with accusations that he obtained all the decedent’s property during her lifetime. While this testimony is proper insofar as it may indicate conditions existing prior thereto, that is, on the date of execution of the propounded instrument, it must be remembered that the issue to be determined is the fraud and undue influence on April 20, 1956, upon which date the instrument offered for probate was executed. As to that date, there is little evidence to raise. any suspicion as to the validity of the will.
The testatrix employed the services of Mr. Finan, an attorney who had represented her for some eight years in real estate and mortgage transactions. The attorney did not know Mr. Checola before the execution of the will, and its provisions were discussed privately by the decedent with Mr. Finan, while Mr. Checola was out of the office. When the will was executed, it was read aloud to the testatrix because of her blindness, and she was questioned as to whether that was her intention and plan. One of the witnesses to the will testified that, prior to its *852 execution, Mrs. McLean talked to her on the telephone and said she was considering leaving her estate to a friend who was very good to her. Another witness, Mrs. Dietz, testified that in February, 1956, Mrs. McLean told her about a nice man who did her shopping, and later that Spring that she had made a will in which her deceased husband’s relatives were not to get a “ penny ”,
In July, during the preparation of the power of attorney by William Cocks, Jr., another attorney retained by the decedent, the fact that such power would give Mr. Checola the right to handle her affairs was explained to the testatrix, and she then executed the power.
The first important piece of evidence which might indicate that all was not well in the McLean-Checola relationship occurred one year after the execution of the power of attorney, and 15 months after the making of the will. At that time, Mrs. McLean visited the office of William Beglin, a third attorney consulted by her. Mr. Beglin called Mr. Finan on the telephone and told him that Mrs. McLean wished to have her will destroyed. Mr. Finan refused to destroy the will at the request of Mr. Beglin without some direct authority from his client. Mr. Finan stated that Mrs. McLean called him later that same day, and told him to leave the will “as is ”. However, Mr. Beglin testified that in a subsequent telephone conversation on August 1,1957, with Mr. Finan, Mrs. McLean herself confirmed his original request to have the will destroyed. Mr. Finan denies this conversation. These incidents are the basis for the second objection of revocation or “attempted” revocation. The motion to dismiss allegation two of the objections as insufficient for revocation is granted.
The court gives weight to the fact that when Mrs. McLean was in the office of Mr. Beglin, the will of April 20, 1956, could have been revoked by a new will, or by a written revocation, without any action on the part of Mr. Finan or even communication with him. The fact that the will was not so revoked gives credence to the testimony of Mr. Finan that the testatrix told him to leave everything “as is ”. Clearly there was no revocation or “ attempted ” revocation at this time.
Subsequently, at Mr. Beglin’s request, Mr. Checola turned over to Mr. Beglin a bond and mortgage and thereafter remained away from Mrs. McLean’s premises until later in September, 1957 when he returned during Mrs. McLean’s confinement in the hospital. She returned home from the hospital on November 4, 1957, and died there on November 21, 1957.
*853 The problem before this court on the present motion is whether there is sufficient evidence in this case to submit the question to a jury, if there were a jury in this proceeding. On that point, the Court of Appeals has recently spoken in a somewhat similar situation in Matter of Walther (6 N Y 2d 49 [1959]). It is recognized that there is one important factual difference between this and the Walther case, in that the beneficiary there was a sister of the testatrix while in this case Mr. Checola is a stranger. However, the Court of Appeals has restated the rule broad enough to include both categories:
“ ‘ It must not be the promptings of affection; the desire of gratifying the wishes of another; the ties of attachment arising from consanguinity, or the memory of hind acts and friendly offices, but a coercion produced by importunity, or by a silent resistless power which the strong will often exercises over the weak and infirm, and which could not be resisted, so that the motive was tantamount to force or fear * * * lawful influences which arise from the claims of kindred and family or other intimate personal relations are proper subjects for consideration in the disposition of estates, and if allowed to influence a testator in his last will, cannot be regarded as illegitimate or as furnishing cause for legal condemnation. ’ ’ ’ (Matter of Walther, supra, pp. 53-54; emphasis supplied.) Since this guidepost of the Court of Appeals treats other personal relationships, including the memory of kind acts and friendly offices in the same category as the ties arising from consanguinity, the principles of the Walther case may be applied to the matter now before this court.
Except for the fact that Mr. Checola may have been in the room when the will was executed, the situation is similarly devoid of direct evidence of interference by the proponent in the making of the will. He did not draft the document, did not dictate it, and was not present when its contents were discussed. The circumstances indicate that the will was the product of the free and unfettered act of the testatrix.
There are many instances in the testimony which are consistent with the hypothesis that the chief beneficiary procured the will by undue influence. The special guardian was justified and, indeed, was duty bound to present this evidence to the court. However, “while the evidence in this case may be consistent with the hypothesis that the chief beneficiary induced the will by undue influence, the evidence is equally consistent with the assumption that the will, expressed the decedent’s own voluntary intent. * An inference of undue influence cannot be reasonably *854 drawn from circumstances when they are not inconsistent with a contrary inference.’” (Citing cases.) (Matter of Walther, supra, p. 54.) Htire the court has found no evidence inconsistent with motivation by the memory of ‘1 kind acts and friendly offices ”.
The testimony by Mr. Cocks of the telephone calls of complaint from Mrs. McLean concerning Mr. Checola covers a period from the Spring of 1956 to November, 1957, during which period Mr. Cocks drew a power of attorney for the decedent to Mr. Checola and explained to her that it would give Mr. Checola the right to handle her affairs. If Mr. Cocks had taken such complaints as serious evidence of undue influence, he would not have prepared the power of attorney and supervised its execution.
The testimony of Mr. Beglin as to the testatrix’ desire to destroy her will cannot, for the same reason, be given serious weight as evidence of undue influence. From July 15, 1957, to November 21, 1957, the date of death of the decedent, there was ample opportunity to revoke the instrument now offered for probate by a subsequent will or written instrument of revocation. Even when Mrs. McLean was in his office, Mr. Beglin did not have her effect such a revocation.
Here, contrary to the Walther case, the draftsman of the will was not a stranger, but an attorney who had represented the deceased for some eight years. Furthermore, the fact that Mr. Checola was named sole beneficiary is not in itself evidence of undue influence.
Similar to the will in the Walther case, we have here an instrument which is not unnatural nor the result of an unexplained departure from a previously expressed intention of the decedent. There is no indication of any disposition of her property which the decedent desired to make other than the instrument now offered for probate. Unlike the Walther case, decedent herein had no known blood relatives. It is not unnatural that she wished her property to go to a stranger who helped her rather than to unknown relatives or escheat to the State. There was no sense of kinship or family duty to overcome here.
The proponent in this proceeding certainly took steps to ingratiate himself with the testatrix, and there is no doubt in the mind of the court that he did so in anticipation of financial benefit to himself. From the acts of the proponent from January, 1956 until the death of the testatrix in November of 1957, the conclusion is inescapable that he was engaged in obtaining control of the property of the decedent. But these facts are not *855 enough to show that the instrument offered for probate was the product of force on the part of the proponent, or of fear on the part of the testatrix. The will may be equally explained by the fact that the testatrix desired her property to go to the “ friend who was very good ” to her.
Taking the record as a whole, and the circumstances surrounding the execution of the will, individually and collectively, there is nothing inconsistent with the assumption that the will expresses the voluntary intent of the testatrix. The motion to dismiss the objections on the ground that the contestant has failed to make out a case constituting fraud and undue influence is granted, and the will is admitted to probate.