GINGRICH *v.* BRADLEY.

5-2222                                          341 S. W. 2d 33

Opinion delivered December 12, 1960.

*J. Wesley Sampier* and *Duty & Duty,* for appellants.

*Eugene Coffelt,* for appellee.

GEORGE ROSE SMITH, J. This is a will contest in which the appellants seek to set aside the will of Mattie Syme, who died October 18, 1959, at the age of 78. The appellants challenge the will on the ground of undue influence and testamentary incapacity. The proponent of the will is its principal beneficiary, the appellee Bob Bradley, a minister who was 31 years old when Mrs. Syme executed the will on November 7, 1958. The probate court upheld the will.

A narrative of the facts may conveniently begin in November of 1955, when young Bradley left Joplin, Missouri, to assume the pastorate of Christ's Church, a nondenominational church at Rogers, Arkansas. In the following year the young people in the congregation advertised a lawn-mowing service as a means of raising money for the church. Mrs. Syme, who belonged to a different church, met the young minister in the course of making arrangements to have her grass cut.

A widow of moderate means, Mrs. Syme was then living in a home which she owned in Rogers. Three of her four children, all by her first husband, were still living, but none of them resided with their mother at Rogers. One daughter, the appellant Mary Gingrich, lived within the county, at Bentonville. The second daughter, Ruth Earp, who has since died, was then living in Ohio. The appellant Glenn Daniels, a son, lived in Texas, and Mrs. Syme's grandson, the appellant William V. Daniels, lived in Ohio. There is an abundance of testimony, given by witnesses on both sides of the case, to show that the testatrix considered her children and her grandson to be culpably inattentive to her in her old age. She often complained about the infrequency of their visits; it cannot be doubted that she was lonely.

In 1957 Bradley and Mrs. Syme again met one another as in the preceding year. Bradley says that upon this or a later occasion he inquired about Mrs. Syme's church affiliation. She expressed a desire to attend church if transportation could be arranged, and Bradley offered to come for her whenever she wished.

Mrs. Syme eventually accepted this offer, and by the spring of 1958 she was attending Bradley's church with some regularity, usually riding with Bradley or with his wife.

In about March of 1958 Mrs. Syme's doctor suggested that she give up living by herself. She accordingly sold her house at Rogers and moved into the home of her daughter, Mrs. Gingrich, at Bentonville. At that time Mrs. Syme gave her daughter a check for $6,000, dated April 2, 1958. Why this money was paid is a disputed issue of fact, but the evidence preponderates in favor of the view that in return for the money Mrs. Gingrich was to take care of Mrs. Syme for the rest of her life.

At about this time Mrs. Syme executed what proved to be the next to the last of several wills made by her. This will, dated March 28, 1958, was prepared by her regular attorney, Wesley Sampier; its validity is not questioned. By this will the testatrix left Mrs. Gingrich five dollars, thereby disinheriting this daughter without explanation. After a bequest of $500 to the testatrix's grandson the rest of the estate was left equally to her son Glenn and her other daughter, Ruth.

After staying with Mrs. Gingrich for less than three months Mrs. Syme became dissatisfied and moved into a hotel at Bentonville, where she remained until the last few weeks of her life. During the months between Mrs. Syme's departure from Rogers in March and the execution of the contested will in November Bradley continued to visit her and to take her to church on Sunday at least part of the time. In August Mrs. Syme joined Bradley's church.

The only description of the events immediately preceding the execution of the disputed will comes from Bradley himself. He says that in October or November Mrs. Syme brought up the subject and expressed her intention of leaving all her property to him, saying, among other things, that he had made it possible for her to go to church and to other places after she had

been pretty well confined. Bradley discouraged the suggestion, telling Mrs. Syme that it would not be right for her to leave everything to him. In a few days, however, Mrs. Syme renewed her suggestion and seemed determined to carry it out. Bradley jotted down notes about her wishes and later took them to an attorney, Eugene Coffelt. Bradley says, and we find it natural to believe, that Coffelt thought it necessary to consult Mrs. Syme before actually preparing the will.

The will was executed under Coffelt's supervision in the office of Coffelt's uncle, which was on the ground floor of the hotel where the testatrix lived. One of the attesting witnesses thought, without being sure, that Bradley was present; but we think the weight of the evidence supports the trial judge's belief that Bradley was not present at the execution of the will.

The will is rather long, but its provisions may be summarized as follows: (a) There is a bequest of $100 to the testatrix's grandson. (b) The testatrix declares that she has advanced or loaned at least $7,300.00 to Mary Gingrich. She gives $3,325.00 of this money to Mrs. Gingrich and directs that her administrator collect the remaining $3,975.00 and divide it equally among Ruth Earp, Glenn Daniels, and Bob Bradley. (c) The three beneficiaries just named are to receive the proceeds from the sale of the real estate in Bentonville, after the payment of medical and funeral expenses and the costs of administration. (d) All the rest of the estate is given to Bob Bradley, who is named as executor. (e) There is a forfeiture clause by which anyone who contests the will is precluded from receiving any benefits under it.

About a month after the execution of the will Mrs. Syme apparently learned (and, if so, the information was correct) that her daughter Ruth was afflicted with cancer. A codicil, prepared by Coffelt and duly executed on December 5, provided that Bob Bradley should receive Ruth's share if Ruth predeceased her mother, the testatrix.

During the remaining eleven months of Mrs. Syme's life Bradley and his wife continued their kindnesses toward the elderly woman. On two occasions Bradley drove Mrs. Syme to Ohio for overnight visits with her daughter Ruth, who died in April of 1959. The present contest was instituted by the appellants after the death of Mrs. Syme on October 18, 1959.

We have no hesitancy in saying that the contestants' proof falls short of establishing the charge of testamentary incapacity. Although Mrs. Syme suffered from arteriosclerosis it is not contended that she was mentally incompetent in the latter part of March, 1958, when she executed the will drafted by Mr. Sampier, entered into a contract for the sale of her house, and a few days later gave her daughter a check for $6,000. There is proof that the testatrix's condition became progressively worse, but the weight of the evidence supports the trial court's finding that she did not lack testamentary capacity on November 7, 1958.

The issue of undue influence presents a more difficult question. There is no direct proof of improper conduct on the part of the appellee, but the appellants insist that two circumstances strongly indicate the existence of undue influence: First, the testamentary scheme is unnatural in that the testatrix's own descendants do not receive a fair share of the estate. Secondly, the appellee, as the testatrix's spiritual adviser, occupied a confidential relationship toward her, had both the motive and the opportunity to exert a sinister influence, and in fact acted at least as the intermediary in communicating her wishes to the attorney who prepared the will. These arguments are forcefully presented, but they do not persuade us that the probate judge was wrong in his decision.

As to the first point, the testatrix had the privilege of dividing her estate any way she chose, and it is shown by the will executed in March that she had no hesitancy about completely disinheriting at least one of her children. There is, as we have indicated, ample evidence to

support the view that Mrs. Syme resented what she regarded as a want of affection on the part of her children.

Furthermore, we are not convinced that the testamentary scheme, if viewed through Mrs. Syme's eyes, is quite as unnatural as the appellants consider it to be. The estate consists of three principal assets: (a) The Bentonville real estate, inventoried at a value of $6,500; (b) the balance due on the contract for the sale of the Rogers house, inventoried at a value of $8,916.77; and (c) the indebtedness of $7,300.00 that is mentioned in the will as being owed to the testatrix by Mary Gingrich. (The appellants insist that this debt was not really owed, but we are firmly of the view that the probate judge was right in rejecting Mrs. Gingrich's testimony on this disputed point.)

When the will was executed Mrs. Syme was living in a hotel at a monthly expense of $100, plus her other living costs. Presumably she expected to pay those expenses from the income accruing from the sale of the house in Rogers, as it does not appear that she had any other liquid asset. If the testatrix believed, as nearly every human being does, that she would continue to live for the indefinite future, she might well have concluded that by the time of her death the balance payable upon the sale of the Rogers house would have been entirely consumed. In that event her division of the estate is not especially unnatural. If the sale of the Bentonville real estate should produce $6,000 after the payment of the expenses charged against it by the will (and the inventory indicates that this figure is not unreasonable), then it will be found that the testatrix's method of dividing this money and the sum owed by Mrs. Gingrich will result in exactly equal payments of $3,325.00, to the penny, to each of the four principal beneficiaries of the will. We do not know, of course, if this distribution is what Mrs. Syme had in mind, but there is no other ready explanation for her method of dividing the amount assertedly owed to her by her daughter.

Upon the second point urged by the appellants we recognize the fact that the circumstances surrounding the execution of this will call for the closest scrutiny and may even give rise to a rebuttable presumption that undue influence was exercised. *McDaniel* v. *Crosby,* 19 Ark. 533; *McCulloch* v. *Campbell,* 49 Ark. 367, 5 S. W. 590; *Orr* v. *Love,* 225 Ark. 505, 283 S. W. 2d 667. But, after considering the record as a whole, we do not find that the weight of the evidence requires the will to be set aside.

There is no proof whatever tending to reflect upon the character of Bradley or his wife. There is no real reason to read a mercenary or sordid motive into conduct that is certainly not unusual or extraordinary in the circumstances of this case. Indeed, the testimony indicates clearly enough that the Bradleys' thoughtfulness was not confined to this testatrix; similar kindnesses were extended to other members of the congregation. The actions that might be considered really unusual, such as Bradley's two trips to Ohio, took place after the will had already been signed. Evidence of such conduct is admissible for its bearing upon the proponent's actions as a whole, but influence exercised after the execution of the will does not affect the validity of the instrument. Page on Wills (1960 Ed.), § 15.10; Thompson on Wills (3d Ed.), § 146. We are inclined to conclude our opinion with the same thought that we expressed in *Shipley* v. *Campbell,* 226 Ark. 786, 294 S. W. 2d 59: "There is proof that Mrs. Mann, [the testatrix] preferred living with the Thomases to living with her cousin. There is proof that she was happy while in their care. Theirs was perhaps the only real kindness that Mrs. Mann received from anyone after the death of her husband. The fact that her recognition of that kindness may seem to have been unduly liberal is not a sufficient reason for declaring her will to be invalid."

Affirmed.