262 N.W.2d 201 (1978)
In the Matter of the ESTATE of Robert W. HAMM, Deceased.
Gerald M. BALDWIN, Executor named in the Will, Proponent and Appellant,
v.
Billie Jean HAMM, Contestant and Appellant, and
Dorothy E. McCall, Evelyn M. Hruby, Ralph D. Byers, and Lloyd M. Byers, Contestants and Appellants.
Nos. 11716, 11728 and 11745.
Supreme Court of South Dakota.
Argued February 15, 1977.
On Second Reassignment February 8, 1978.
Rehearing Denied March 28, 1978.
*202 Horace R. Jackson and Donald R. Shultz of Lynn, Jackson, Shultz, Ireland & Lebrun, Rapid City, for proponent appellant Baldwin.
Joseph M. Butler of Bangs, McCullen, Butler, Foye & Simmons, Rapid City, for contestant and appellant Hamm.
William G. Porter of Costello, Porter, Hill, Nelson, Heisterkamp & Bushnell, Rapid City, for contestants and appellants, McCall, Hruby, Ralph D. Byers and Lloyd M. Byers.
MORGAN, Justice (on second reassignment).
The decedent, Robert W. Hamm, in the 76th year of his life executed a will on the 27th day of September, 1973, which was presented to the Circuit Court of the Seventh Judicial Circuit for Custer County for probate on the 25th day of March, 1974, the decedent having departed this life on the 22nd day of March, 1974. The probate of the will was contested by his widow, Billie Jean Hamm, and four others who were first cousins of the decedent, upon the usual grounds including the lack of testamentary capacity and that the will was procured to be made and executed while the decedent was under the undue influence of attorney Gerald M. Baldwin who had prepared the will and who was named therein as executor and sole trustee. After an extensive hearing and briefing by the proponents and opponents the trial court held that the decedent did have the requisite testamentary capacity but denied the will probate upon the grounds that it clearly showed the effect of undue influence on the part of Baldwin for three reasons: (1) the testator named Baldwin the executor and trustee without bond after only a brief acquaintance and a limited number of contacts; (2) the nonexistent or very limited contacts with the beneficiaries of the trust evidenced an unnatural disposition of the testator's estate; and (3) when Baldwin included the Custer Nursing Home in which he had a financial interest as a potential beneficiary under an ostensible charitable trust in his discretion as sole trustee he deliberately created an ambiguity and inconsistency and a source of potential personal profit. While we agree with the trial court's finding as to testamentary capacity we disagree with the finding as to undue influence and accordingly reverse and remand.
Some insight into the rather unusual history of the decedent is necessary to review the situation existent at the time the will was drafted, a time which was perhaps one of the most turbulent periods in the decedent's lifetime. The record discloses that the decedent Hamm's first wife, who died in 1961 or 1962, bore him one child, a son Arlon. He was married a second time briefly to a prostitute named Mary, who plays no part in these proceedings. His third endeavor in the matrimonial field occurred in 1969 when at age 72 he married another prostitute, 33-year-old Billie Jean, one of the opponents. The marriage lasted until late 1971 when Hamm instituted divorce proceedings against Billie Jean, who had apparently taken off for other climes with his car and a portion of his money. Hamm suffered a stroke in early 1972, Billie Jean returned in April or May, 1972, and the couple were reunited in wedlock. During this marriage the couple, or Hamm individually, resided in the vicinity of Sturgis, Meade County, South Dakota.
During the balance of 1972 Hamm was hospitalized on three occasions varying from one week to approximately one *203 month, with illnesses variously diagnosed as senile dementia, cerebrovascular insufficiency and arteriosclerotic heart disease. Billie Jean got into some problems with the law related to a drug charge and she packed Hamm off to Ely, Nevada, admittedly to "get out of the state for a year" on advice of her counsel. In Nevada, Hamm also required hospitalization two or three times, purportedly for the same reasons although the records are not in evidence. The couple returned to South Dakota on July 4, 1973, going to Custer, where Hamm was immediately installed in the Custer Nursing Home, where he resided until his demise. Billie Jean rented a house in the vicinity. One of her first acts upon settling in Custer was to engage Gerald M. Baldwin, an attorney practicing in Custer, as her counsel, paying him a $50 retainer fee.
On August 1, 1973, Arlon Hamm, described as a wealthy, single, Meade County rancher, was murdered on his ranch near Sturgis. The next day Robert W. Hamm, Arlon's sole heir at law, talked to his attorney at Sturgis about taking care of the estate, but the following day at the behest of Billie Jean he engaged Baldwin to handle the estate and fired his former attorney. Billie Jean emerged as a prime suspect in the murder investigation and was arrested on August 24, 1973, and incarcerated in the Custer County jail, and then removed to the Meade County jail at Sturgis. Baldwin consulted with her initially but was then faced with a conflict of interest in representing Billie Jean, the alleged murderess or conspirator, and in representing Robert W. Hamm as administrator of the estate of the victim, which estate had a net valuation of approximately $350,000, Baldwin chose to stay with the estate representation and candidly admitted that that was where the money was. He did apparently cooperate with Billie Jean's court-appointed counsel and aided his former client in other ways by securing, protecting and then transporting some belongings to Sturgis for her, by seeing to the payment of some bills on her behalf, and answering a claim by a creditor. Although decedent had an early, strong suspicion that Billie Jean was involved in Arlon's murder Baldwin professed a strong belief in her innocence until her accomplice or co-conspirator confessed and directly implicated her. The trial resulted in a verdict of guilty of conspiracy. That conviction was on appeal in November, 1974, when the hearing on the will contest was heard.[1]
The will offered in probate and contested was the eighth known will executed by the decedent, all of which were prepared by other attorneys than Baldwin. The seven others or their copies were offered in evidence covering a period of some ten years and variously reflecting the changes in the decedent's marital situation. The first shortly after the first wife died, the third after marriage to Mary, the fourth after the divorce, the fifth after marriage to Billie Jean, the sixth simultaneous with the divorce proceedings, and the seventh upon the remarriage. In almost every will the attorney who had prepared the same was nominated as executor or alternative executor. None of them had any trust provisions.
The testamentary disposition provided for in the contested will involves a trust comprising all of the assets after payment of the usual expenses of last illness, burial, creditor's claims, and administrative expenses. The widow Billie Jean was to receive $2,500 a year if, and only if, she was not convicted of the murder, conspiracy to murder, or a lesser included offense arising out of the death of Arlon Hamm. In the event of such conviction the trustee had the discretion to distribute the corpus and income
"to any person, persons, association, corporation, charity, or organization of any nature whatsoever, for the express and limited purpose of providing facilities, development, restoration or construction of facilities for community facilities within the City of Custer, South Dakota, including but not limited to the facilities at the Custer Nursing Home, the Custer Community Hospital, the Custer Senior Citizens *204 Center, or the City of Custer, and provided that said monies and trust funds shall be distributed only to nonprofit, charitable and public facilities within the City of Custer, and preferably for the use and enjoyment of the elderly of Custer, South Dakota;"
the trust provision further authorized the trustee
"to retain and accrue said trust funds for a period not to exceed twenty (20) years from the date of my death, for application as afore stated, or to make distribution in total at any time after my decease, provided that no distribution shall be made to any individual, firm, or corporation for personal or private gain or profit."
The will further appointed Gerald M. Baldwin, Attorney at Law, Custer, Custer County, South Dakota, as the executor and trustee of the said Hamm trust and also as executor of the will, so to serve in all capacities without bond.
The Custer Nursing Home mentioned in the will and in which the decedent was a resident at the time of the execution of the will had been constructed and equipped through the use of municipal revenue bonds under an arrangement whereby a corporation denominated the Home Corporation had deeded the land comprising some five acres to the City of Custer. The city caused the bonds to be issued and the home to be constructed and equipped with the proceeds thereof and the same leased back to the Home Corporation which in turn subleased it to the C & M Corporation, the operating corporation, which owned or operated various nursing homes in the states of South Dakota and Iowa. The lease from the city to the Home Corporation provided for payment of monthly rental of $9,000 per month during the fifteen-year term of the lease which sum was apparently sufficient to pay off the revenue bonds and the accrued interest and any liability for payment in lieu of taxes, because at the end of the fifteen years the lease gave the Home Corporation the option to purchase the facility for the payment of $1.00. The sublease arrangement with the C & M Corporation was for a rental of $9,000 per month for a period of twenty years with no options to purchase. The Home Corporation which originally comprised some five investors has since been dissolved and all of the interest in the corporation vested in two persons, Gerald M. Baldwin and one other individual not connected in any way with these proceedings.
The trial court's memorandum decision and the findings of fact and conclusions of law based thereon held that the proponents of the will had sustained the burden of proving that the decedent possessed the required testamentary capacity at the time of the execution of the will. The trial judge further found that the contestants failed to show that the will was procured by duress, menace, or fraud, but held that the evidence did show that the will was procured by the undue influence of Gerald M. Baldwin and denied probate, which denial was incorporated in an order of the court dated the 31st day of March, 1975, and filed on the 3rd day of April, 1975. By this appeal we are called upon to review the decision of the trial court.
Our appellate review is governed by the clearly erroneous rule as set out in SDCL 15-6-52(a).[2] Our function is not to decide factual issues de novo. The question is not whether we would have made the same findings the trial court did, but whether on the entire evidence we are left with a definite and firm conviction that a mistake has been committed.[3]
We are called upon to review the trial court's findings as to the existence of the four indicia of undue influence which are: (1) susceptibility of the testator to undue *205 influence, (2) opportunity for the exercise of undue influence, (3) disposition to exert undue influence, and (4) a result in the will showing the affect of such undue influence.[4]
As to the first element, the trial court found that the decedent was clearly susceptible to undue influence, which finding it based on the fact of the two marriages to Billie Jean; the first in 1969 and the second after he had divorced Billie Jean, after she left him taking his car and money, then suffered a stroke, but remarrying her in 1972 when she returned to him. She then took him from his home in Sturgis to Ely, Nevada, and thence to Custer. The court found that as a result of her intervention decedent changed lawyers in his son's estate, literally overnight, which influence incidently caused the estate to be removed from one attorney to Mr. Baldwin.
We agree with the trial court that the actions of the decedent over the year and a half prior to the execution of the will evidenced at least up to shortly before that time his extreme susceptibility to the influence exerted by Billie Jean; however, it is not her influence that we are here concerned with. The only involvement of her influence that the trial court points to is that the decedent turned to Baldwin for legal representation and discontinued his relationship with his former attorney, Hermon Walker. Billie Jean testified that she made the recommendation because she was dissatisfied with Walker's previous representation in a matter in which she gave him a $2,000 retainer and he proceeded to go out and get drunk. Since Mr. Walker has recently been before this Court admitting his status as an alcoholic during that period,[5] we can only conclude that Billie Jean gave her husband good advice. The trial court held that the execution of the will naming Baldwin as executor and trustee after a brief acquaintance, two brief conferences, and without independent advice indicates susceptibility to Baldwin's influence. This argument might have some merit but for the fact that the evidence showed that in each of the seven previous wills decedent had likewise named the draftsman his estate advisor, as executor or alternate executor depending on the circumstances. We find therefore that the fact that he executed the will does not indicate a susceptibility to Baldwin's influence, but rather follows a trend set over a period of some ten years before he even met Baldwin. The use of a trust was clearly dictated by the exigent circumstances at the time it was executed. The previous wills indicated a disposition to make charitable bequests inasmuch as he had named a church in Sturgis as contingent beneficiary in several of them.
The second element which the trial court likewise found to exist was the opportunity to exert influence over the decedent and thereby effect the wrongful purpose. In this element the court pointed out that Mr. Baldwin was acting as the decedent's attorney; that all contacts of the decedent outside of the nursing home, his visitors, mail and telephone calls were monitored and cleared by Mr. Baldwin for a period of time prior to the execution of the will; and that after the arrest of Billie Jean, Mr. Baldwin was the decedent's sole advisor.
We have no quarrel with the court's finding that Baldwin was the decedent's attorney and advisor; however, this Court has previously held that the mere existence of a confidential relationship does not require a finding of undue influence and does not raise a presumption of undue influence.[6] It is safe to say that every testator in the preparation of his will relies to some extent on the advice of his attorney. There is nothing on this record to indicate that it should have been any different in this instance. However, with respect to the finding by the trial court that the visitors, incoming mail and incoming telephone calls had been monitored at the direction of *206 Baldwin, we find the record confusing but it would appear more apparent to us that the source of the request for monitoring was Billie Jean. At best, Baldwin only acceded to passing on incoming correspondence which was delivered to him.
As to the third element, the trial court conceded that Baldwin's professional reputation as an attorney was good and that the evidence was wholly circumstantial but, viewing the evidence as a whole and considering the contents of the will itself, found that Mr. Baldwin had evidenced a disposition to exert undue influence over the decedent. He pointed out that Baldwin was attorney for Billie Jean in the first instance and through her efforts became the attorney handling the Arlon Hamm estate. However, when Billie Jean was arrested and charged with the murder of Arlon, Baldwin recognizing the conflict of interests chose to discontinue his representation of Mrs. Hamm and to continue with the more lucrative estate business, notwithstanding his then strong belief in her innocence. We see no basis to fault him for making what would appear to be a wise and reasonable choice. Some attorneys may prefer estate practice to criminal defense practice. Some may prefer money in the bank to participation in a cause celebre. Whatever the reason, we cannot agree with the trial court's holding that this is evidence of a disposition on the part of Baldwin to unduly influence the decedent.
The trial court, however, found that the strongest evidence of disposition to exert undue influence for an improper purpose lies in the provisions of the will itself, particularly in Section VII(b), previously quoted. The court found that the mention of the "Custer Nursing Home" as a potential beneficiary under the trust evidenced the requisite disposition. The evidence disclosed that this was the only nursing home in Custer and that Mr. Baldwin was one of two successors in interest to the corporation that had an option to buy the nursing home for $1.00 when the city revenue bonds are paid off. The trial court stated that by naming the "Custer Nursing Home" as a potential beneficiary knowing that it could not qualify as a nonprofit, charitable corporation, he deliberately created an ambiguity and inconsistency and a source of potential personal profit. While this appears to be the strongest point in the trial court's decision, the evidence does not support it with that strength. Section VII(b) absolutely prohibits the distribution of any of the trust income or corpus to other than nonprofit, charitable and public facilities within the city of Custer:
"* * * provided that said monies in trust funds shall be distributed only to nonprofit, charitable and public facilities within the City of Custer, and preferably for the use and enjoyment of the elderly of Custer, South Dakota; * * * but provided that no distribution shall be made to any individual, firm, or corporation for personal or private gain or profit."
It is true that (b) does include the Custer Nursing Home as one of the facilities named as representative beneficiaries of the trust created by the will. The evidence is undisputed that the Custer Nursing Home was the first place that the decedent had found comfort and ease for some time. His only son was dead and his wife accused of implication in his murder. His distant relatives who are contesting the will had had no contact with him for years. He expressed a desire to do something for the Home. Baldwin advised him that it was not a charitable institution. Upon decedent's insistence Baldwin suggested that perhaps at a later date some part could be deeded off and dedicated to comply with the decedent's wishes. We cannot overlook the fact that the trust would be subject to court administration under the provisions of SDCL 21-22 and SDCL 55-9.[7]
It appears that if Baldwin were the blackguard that the contestants paint him *207 he would have deleted all reference to the Home and assured himself of the trusteeship with all of the increments and fees attended thereto. On the other hand, the inclusion of the Home in the list indicates an attempt on the part of the draftsman to comply with the wishes of the decedent, wishes which the trial court concedes are not so unnatural as to be important, considering the family circumstances of the decedent at that time.
As to the fourth element, a result in the will showing the effect of such undue influence, the court felt strongly that it did, again pointing out such a relationship between Hamm and Baldwin and that at the time of the execution of the will the decedent had known Baldwin less than three months, they had discussed the provisions on only two prior occasions, their total contacts were less than a dozen times, yet the decedent in his will named Baldwin as executor of the will and trustee of a considerable trust, all without bond and with the broadest possible authority to dispose of the assets without court order, to retain the fund for up to twenty years and with sole discretion as to whom the trust estate was to be ultimately distributed to. In view of these facts, the court concluded that Baldwin obtained a substantial benefit under the terms of the will. The court wholly fails to take note that there does not appear to be any viable alternative suggested by the contestants. Would it have been better to have left the estate outright to Billie Jean? The bulk of it was received by the decedent as sole beneficiary of Arlon's estate, the son whom she had conspired to murder. Should he have left it to distant relatives with whom he had had no contact for years, who did not appear on the scene until a sizeable estate was offered for probate? Should he have appointed a bank as trustee when he obviously had a distrust for such institutions, not entirely unfounded? The record discloses that a bank attempted to step into the administration of Arlon's estate, purportedly to protect a minor obligation owed them. This action irritated decedent and he had arranged to pay off the obligation to prevent the unwanted intervention.
From our examination of the record we are left with the definite and firm conviction that the court erred in its findings of fact and conclusions of law and accordingly we reverse as to the denial of probate on the grounds of undue influence and remand the matter to the court with instructions to admit the will to probate.
In view of our disposition of the will contest, the allowance of fees which the contestants cross-appealed is affirmed.
WOLLMAN and ZASTROW, JJ., and McKEEVER, Circuit Judge, concur.
DUNN, C. J., dissents.
McKEEVER, Circuit Judge, sitting for PORTER, J., disqualified.
DUNN, Chief Justice (dissenting).
The majority opinion correctly points out that this court's review is governed by SDCL 15-6-52(a), which states that findings of fact shall not be set aside unless clearly erroneous and that due regard shall be given to the opportunity of the trial court to judge the credibility of witnesses. The trial court conducted an extensive hearing on this matter, and its findings of fact were supported by evidence at the hearing. Because I feel the majority has exceeded its scope of review in substituting its judgment of the evidence for that of the trial court, I would dissent.
NOTES
[1] The conviction has since been affirmed. State v. Hamm, S.D., 234 N.W.2d 60.
[2] SDCL 15-6-52(a) provides in part:

"Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. * * *"
[3] In Re Estate of Hobelsberger (1970) 85 S.D. 282, 181 N.W.2d 455.
[4] In Re Rowlands' Estate (1945) 70 S.D. 419, 18 N.W.2d 290.
[5] See In Re Walker, S.D., 254 N.W.2d 452.
[6] In Re Rowlands' Estate, supra.
[7] We note that the Attorney General's Office did make an appearance in the trial court pursuant to SDCL 55-9-5.