In the Matter of the ESTATE OF Lester I. JONES, Deceased.

Nos. 13399, 13400.

Supreme Court of South Dakota.

Argued Sept. 30, 1981.

Decided June 2, 1982.

Rehearing Denied July 9, 1982.

Gene Paul Kean of May, Johnson, Doyle & Becker, Sioux Falls, for appellants Jerald Hansen and William Harold Hansen.

Robert Frieberg of Frieberg, Frieberg & Peterson, Beresford, for appellant John W. Thomson.

John H. Zimmer of Zimmer, Richter & Duncan, Parker, for contestants.

DUNN, Justice (on reassignment).

This is an appeal from a will contest involving appellees Lawrence Rohl, Ronald Rohl and Diane Schanzenbach (contestants) and appellants John Thomson (Thomson) and William and Jerald Hansen (Hansens). The trial court found that the decedent, Lester I. Jones (Jones), executed a will on November 6, 1979, while acting under undue influence and denied probate of the will. We affirm in part, reverse in part and remand.

Jones died on January 6, 1980, at the age of seventy-two. He and his wife, who predeceased him, had no children. During his life, Jones acquired ownership of a large amount of property including farm land and stock in The Bank of Centerville. On

May 31, 1974, Jones executed a will bequeathing the majority of his estate to contestants, who are his niece and nephews. Thomson was named the executor of this will. Jones gave the 1974 will to his nephew, Ronald Rohl, in December of 1978 to keep until his death.

Jones was one of the larger individual stockholders in the Centerville bank. The Thomson family, however, owned the controlling interest in the bank. The evidence indicates that animosity existed between Jones and the Thomson family. Jones had never been elected as a member of the Board of Directors of the bank and primarily did his banking business with other banking institutions. Al Hall, a close friend of Jones, testified that Jones felt the Thomsons wanted to acquire his bank stock. Also, prior to July of 1979, Jones told some of his neighbors that he did not want the Thomsons to have his stock in the Centerville bank.

Jones leased his farm land to William Hansen in March of 1979. William Hansen is a young man, just beginning his farming career, and he had not frequently associated with Jones prior to their business relationship. A former tenant of Jones sued William Hansen in the summer of 1979 claiming an interest in the irrigation equipment on Jones' farm. William Hansen retained Richard Hagerty (Hagerty) of Yankton, South Dakota, to represent him in the lawsuit. Jones accompanied William Hansen to Hagerty's office to discuss the lawsuit in August of 1979. While there, Jones told Hagerty that he would like to make a will.

Hagerty interviewed Jones alone for about thirty minutes that day. Hagerty also discussed the will with Jones on September 24, October 15, and November 2, 1979. At these meetings, Jones said that he wanted to disinherit his relatives. Jones also stated that his 1974 will was destroyed. Because of Jones' poor health and apparent eccentricity in disinheriting relatives, Hagerty asked doctors and other lawyers about Jones' background before preparing the 1979 will.

On October 9, 1979, Jones was admitted to Sacred Heart Hospital in Yankton, South Dakota. His health was very poor and he was unable to care for himself. Jones remained in the hospital until October 22, 1979, when he was transferred to the Good Samaritan Nursing Home in Centerville, South Dakota. Four days later, Jones was transferred to the Viborg Hospital because of a staph infection. By this time, Jones had lost approximately sixty pounds and his total weight was only ninety pounds. On November 2, 1979, he returned to the Centerville nursing home. Five days later Jones suffered a severe septic attack, resulting in his hospitalization in Viborg until his death. The testimony indicates that he was irrational and incompetent at times.

After Jones was admitted to the hospital on October 9, 1979, both Thomson and William Hansen began to visit Jones frequently. On November 8, 1979, Thomson issued three checks on Jones' checking account without authorization from either a power of attorney or a signature card. Subsequently, Thomson issued a number of other unauthorized checks from Jones' account. The evidence also indicates that Thomson purchased coins from Jones' coin collection at less than fair market value and that he sold one of Jones' silver bars to a local businessman.

On November 2, 1979, Jones told Hagerty to prepare a will bequeathing to Thomson all his Centerville bank stock, remaining cash, silver bars and his coin collection; and to William Hansen his farm land. His heirs were disinherited. Jerald Hansen was named the executor of this will. On November 6, 1979, the will was executed. Jones did not give a specific reason for disinheriting his relatives, but did state "won't Bill be surprised" and that his "relatives would not receive even five cents."

On December 4, 1979, Jones withdrew a $35,000 money market certificate from the First Federal Savings & Loan Association. Jones' signature was on the withdrawal request; however, the check's endorsement was not written by Jones. One day later, Thomson sent a letter to the Association

stating that the proceeds of the certificate should be redeposited in a joint account in the names of Jones and Thomson. The trial court determined that neither the revocable proxy nor the signature card contained Jones' signature. The trial court found based on circumstantial evidence that "Mr. Thomson persuaded the decedent to sign the withdrawal request and then signed decedent's name to the check, revocable proxy and signature card making a joint account."

The trial court found that Jones was competent at the time he signed the 1979 will. It found that a confidential relationship existed between Thomson and Jones at the time the will was executed.[1] It also found that Jones was subject to undue influence by Thomson and Hansen at the time of executing his November 6, 1979 will.

In reviewing this matter, we must give due regard to the opportunity of the trial court to judge the credibility of the witnesses. The findings of fact of the trial court shall not be set aside unless they are clearly erroneous. SDCL 15–6–52(a); *In re Estate of Hobelsberger*, 85 S.D. 282, 181 N.W.2d 455 (1970). In addition, we must review the facts in the light most favorable to the findings of the trial court and all conflicts in the evidence must be resolved in its favor. *Matter of Estate of Zech*, 285 N.W.2d 236 (S.D.1979); *In re Metz' Estate*, 78 S.D. 212, 100 N.W.2d 393 (1960).

Thomson contends that the trial court erred in finding that he exercised undue influence on Jones at the time the 1979 will was executed. We disagree. The trial court found that the contestants proved by a preponderance of the evidence the following four essential elements of undue influence: (1) decedent's susceptibility to undue influence, (2) opportunity to exert such influence and effect the wrongful purpose, (3) a disposition to do so for an improper purpose, and (4) a result showing the effects of such influence. *Matter of Estate of Weic-*

*kum*, 317 N.W.2d 142 (S.D.1982); *Matter of Estate of Pierce*, 299 N.W.2d 816 (S.D.1980); *Matter of Estate of Landeen*, 264 N.W.2d 521 (S.D.1978).

With regard to Jones' susceptibility to undue influence, the evidence indicates that Jones' health deteriorated rapidly during the last few months of his life. After a period of rapid weight loss, Jones weighed only ninety pounds. He was unable to care for himself and was at times incompetent. Jones was transferred back and forth between hospitals and the Centerville nursing home between October 9, 1979 and the day of his death on January 7, 1980. The poor condition of Jones' health and his age indicate that he was susceptible to influence on the day he executed his will.

The evidence also indicates Thomson had the opportunity to exert influence on Jones. After Jones was admitted to the hospital on October 9, 1979, Thomson frequently visited Jones. Thomson began issuing checks on Jones' checking account on November 8, 1979, just two days after the execution of Jones' will. These checks were not issued under a power of attorney or authorized by a signature card. Thomson admitted at trial that Jones authorized the payment of three bills by check a couple of days before the checks were issued. The trial court found that Thomson was conducting Jones' business transactions, including the writing of checks, on November 6, 1979 when the will was executed. In addition, Thomson telephoned Hagerty on November 2, 1979 and requested that Hagerty meet with Jones. Hagerty received the directives for the 1979 will during his conversation with Jones on this day. As we stated earlier, we must review the facts in the light most favorable to the trial court's findings. We find that this evidence is sufficient to show that Thomson had the opportunity to exert influence over Jones.

Thomson's disposition to exert undue influence over Jones is shown by his unsuc-

---

1. We need not determine whether the finding of a confidential relationship was clearly erroneous in light of our conclusion that contestants met their burden of proving undue influ-

ence through the four-part test set forth in *Matter of Estate of Weickum*, 317 N.W.2d 142 (S.D.1982).

cessful attempts to obtain Jones' stock in the Centerville bank. Al Hall testified that Jones believed the Thomsons wanted to acquire his bank stock. Jones told a neighbor that he did not want the Thomsons to acquire his bank stock. The testimony indicates that Jones was adamant that Thomson should not acquire the bank stock. It was reasonable for the trial court to infer that Thomson exerted undue influence over Jones to get the bank stock to add to the family ownership of the bank.

Thomson also began taking control over the property in the Jones' estate at about the time or shortly after the will was executed. The trial court found that Thomson persuaded Jones, just one month after the will was executed, to sign a withdrawal request for a $35,000 money market certificate. Thomson then endorsed the check and notified the Association that the proceeds of the certificate were to be deposited in a joint account in the names of Jones and Thomson. These transactions occurred at a time when there was no public knowledge of Jones' final will.

■ Evidence of the conduct of proponents after the execution of the will is admissible so long as it tends to show influence at the time the will was executed. *In re Larendon's Estate*, 216 Cal.App.2d 14, 30 Cal.Rptr. 697 (1963); *In re McLean's Will*, 23 Misc.2d 850, 199 N.Y.S.2d 7 (1960). *See also Gingrich v. Bradley*, 232 Ark. 884, 341 S.W.2d 33 (1960); 1 Page on Wills (1960 Ed.), § 15.10. Evidence of undue influence occurring subsequent to the execution of the will is admissible if it follows so closely to the time of execution of the will as to have evidentiary value. *In re Heineman's Estate*, 144 Neb. 442, 13 N.W.2d 569 (1944). We find that the evidence of improper actions by Thomson at about the time or shortly after the will was executed is relevant to show the disposition of Thomson to exercise undue influence for an improper purpose.

The final element to be considered is whether the will shows the effect of undue influence. Jones executed a will in 1974 leaving the major portion of his estate to a niece and two nephews. His 1979 will disinherited his relatives completely and bequeathed to Thomson his bank stock, cash, silver bars, and coin collection. While nieces and nephews are not considered the natural objects of the testator's bounty, *Matter of Estate of Nelson*, 274 N.W.2d 584 (S.D. 1978); *In re Estate of Fleege*, 89 S.D. 137, 230 N.W.2d 230 (1975), their total disinheritance just five years after the execution of the 1974 will demands close judicial scrutiny. *Nelson*, supra; *Matter of Estate of Hamm*, 262 N.W.2d 201 (S.D.1978).

■ There are a number of facts indicating the exertion of undue influence by Thomson. Hagerty carefully questioned Jones about his reasons for disinheriting his relatives before preparing the 1979 will.[2] Jones did not give a specific reason for disinheriting his relatives, but rather stated "won't Bill be surprised." The evidence indicates that animosity existed between Jones and Thomson regarding the ownership of the Centerville bank stock prior to the time of Jones' hospitalization. However, under the 1979 will, Thomson received the bank stock and other personal property. Thomson also purchased a number of coins from Jones' coin collection at less than fair market value. In addition, Thomson issued checks on Jones' account without the authorization of a power of attorney or a signature card. The evidence is sufficient to show that Thomson did exert undue influence over Jones and that the resulting will showed the effects of this undue influence.

■ We disagree, however, with the trial court's finding of undue influence on the part of Hansens. Contestants failed to prove the third element of the undue influence test, namely that Hansens had a disposition to exert undue influence. The only evidence introduced by contestants on this issue indicates that William Hansen wanted

**2.** There is no indication in the record involving any improper actions on the part of Hagerty. He drew the 1979 will according to instructions

from Jones and after full explanation of its consequences. Any undue influence on Jones had already been accomplished.

to buy the Jones farm. Jones refused to sell the farm, but did enter into a two-year written lease with William Hansen. Jones told William Hansen that he would not sell the farm because he could not afford to sell it and he did not believe William Hansen could afford to purchase the farm. We find this evidence insufficient to prove that Hansens had a disposition to exert undue influence. The trial court's finding of undue influence on the part of Hansens was clearly erroneous.

In conclusion, we affirm appeal # 13400 (finding undue influence on the part of Thomson), and reverse appeal # 13399 (finding undue influence on the part of Hansens), and remand to the trial court for consideration of the partial validity of the will under the doctrine set down in *In re Estate of Lloyd*, 85 S.D. 657, 189 N.W.2d 515 (1971).

WOLLMAN, C. J., and HENDERSON and FOSHEIM, JJ., concur.

MORGAN, J., concurs in part and dissent in part.

MORGAN, Justice (concurring in part, dissenting in part).

I concur in the disposition of the Hansen claim and I dissent to the disposition of the Thomson claim.

First, I believe that a person has a right to dispose of his property as he sees fit. *In Re Rowlands' Estate*, 70 S.D. 419, 18 N.W.2d 290 (1945); *see* SDCL 29-5-1 et seq. The will in question was drawn by independent counsel who the court commended for his efforts. *Compare In re Blake's Estate*, 81 S.D. 391, 136 N.W.2d 242 (1965) and *Estate of Podgursky*, 271 N.W.2d 52 (S.D.1978). The discussions, *ab initio* from August of 1979, indicated that the testator intended to disinherit his distant relatives. The reasons for this are unknown and apparently immaterial. *In re Schaefer's Estate*, 207 Wis. 404, 241 N.W. 382 (1932), approved in *In re Rowlands'*

*Estate, supra.* In an abundance of caution, counsel, because of the implications of the testator's desires, made inquiry of others to ascertain testator's competency. Presumably, if he would have proceeded immediately the will would have been valid in its entirety because the majority seems to stress testator's declining health of the last several months, beginning in September, as rendering him susceptible to undue influence.

I cannot concur in the picking and choosing of the evidence to support the trial court's decision on the one hand and to reject it on the other. I think that the trial court erred all the way. Hansen wanted the land as much as Thomson wanted the stock.* They both attempted to purchase what they wanted. There is no evidence that Thomson did anything more to influence testator to leave him the stock than Hansen did to influence testator to leave him the land.

If the transactions that the majority point to, all of which occurred *after* the testator indicated his desire to disinherit the nieces and nephews, had been conducted by testator's barber or his green grocer, I would find them much more suspicious than I do when they were conducted by his banker whom one would naturally rely on to conduct one's financial affairs when physically indisposed. *See In re Estate of Pierce*, 299 N.W.2d 816 (S.D.1980); *In re Estate of Fleege*, 89 S.D. 137, 230 N.W.2d 230 (1975); *see also Jones v. South Dakota Children's Home Society*, 90 S.D. 126, 238 N.W.2d 677 (1976). This particular banker was so trusted by testator as to have been named executor of his will of 1974, which presumably survives this imbroglio.

* In reading the record, I get the clear impression that when the witness was talking about Thomson trying to get the bank stock he was referring to proponent's father, because he referred to "Old" John Thomson.