100 N.W.2d 393 (1960)
Matter of the ESTATE of Wesley METZ, Deceased.
Herman IMEL, Proponent and Appellant,
v.
Maude METZ, Contestant and Respondent.
No. 9705.
Supreme Court of South Dakota.
January 5, 1960.
Rehearing Denied February 17, 1960.
*394 Roswell Bottum, Rapid City, L. E. Schreyer, Lake Andes, for proponent and appellant.
Morgan & Fuller, Mitchell, W. C. Zeitner, Armour, for contestant and respondent.
HANSON, Judge.
The validity of an instrument purporting to be the last will and testament of Wesley Metz is involved in this appeal. Metz died in a hospital in Rapid City on November 17, 1955. The following day one Herman Imel filed decedent's will dated August 4, 1955, for probate in the County Court of Charles Mix County. The will gave $1,000 to decedent's former housekeeper, Kattie Smith, of Wagner, South Dakota. The entire remainder of the estate was bequeathed to the proponent, Herman Imel, who was also nominated as executor without bond. The will was contested in County Court by Maude Metz, a sister-in-law of the deceased. The County Court denied probate.
The proponent appealed to Circuit Court where the issues were tried de novo before the Honorable George A. Rice, acting Presiding Judge. A jury, acting in an advisory capacity, returned a verdict in favor of contestant. The Court denied probate for the reason the will was procured by the undue influence of Herman Imel. Imel appeals.
The only issue here is whether the evidence preponderates against the trial court's finding of undue influence. In reviewing the evidence in a will contest our province is the same as in any civil action. It must be reviewed in a light most favorable to the trial court's finding and all conflicts in the evidence resolved in its favor.
Influence, to be undue, must be of such character as to destroy the free agency of the testator and substitute the will of another person for his own. In re Armstrong's Estate, 65 S.D. 233, 272 N.W. 799. Its essential elements are (1) a person susceptible to such influence, (2) opportunity to exert such influence and effect the wrongful purpose, (3) a disposition to do so for an improper purpose, and (4) a result clearly showing the effect of such influence. In re Rowland's Estate, 70 S.D. 419, 18 N.W.2d 290.
The burden was on contestant to establish the undue influence of Herman Imel by a preponderance of the evidence. Ekern v. Erickson, 37 S.D. 300, 157 N.W. 1062. This burden was fulfilled to the satisfaction of the trial court. Therefore its finding of undue influence will not be disturbed unless it appears from the record there is a clear preponderance of the evidence against it. In re Peterson's Estate, S.D., 94 N.W.2d 661.
The record shows that at time of death decedent, Wesley Metz, was a single man, 86 years of age. Prior to July 12, 1955, he made his home on a farm near Wagner, in Charles Mix County. His housekeeper was Kate Smith. On July 12, 1955, Metz was in a weakened physical condition and was taken to Rapid City by the proponent, Herman Imel. Metz then owned 613 acres of land in Charles Mix County; 15 head of cattle; 2 horses; farm machinery; some chickens; and cash in the amount of $24,489.94 deposited in banks at Wagner, Armour, Delmont and Sioux City.
The proponent, Herman Imel, was born in Thompson, Illinois, on November 18, 1891. His mother's name was Emma Imel. Imel claims to be decedent's illegitimate son. He testified that Metz visited his mother at Fenton, Illinois, when he was four or *395 five years of age. Imel never saw Metz again until 1926 when he and his wife stopped at the Metz farm while on a trip to the Black Hills. Thereafter, in 1926 and 1927, Metz visited Imel and his wife at their home in Fenton, Illinois, on several occasions, including Christmas of 1927. In March 1928 Imel and his wife moved to South Dakota and began assisting Metz with his farming operations. Imel farmed with decedent for four or five years during which time he and his family lived in a set of buildings owned by Metz and located about one mile from the Metz home. Thereafter Imel farmed for himself until 1937. Imel then went into the construction business in Mitchell. In 1945 he and his family moved to Rapid City where they have since resided.
Metz first executed a will on January 3, 1952, in the office of his attorney, W. C. Zeitner, at Armour, South Dakota. In this will Metz bequeathed the sum of $1 to Herman Floyd Imel "who claims to be my son". Substantial bequests were made to decedent's brother, Webster Metz; decedent's sisters, Emma Graves and Della Beeler; and numerous smaller bequests to other relatives and friends. Webster Metz was named as executor without bond. In February 1953 Webster Metz died and a codicil to the above will was executed on May 6, 1953, naming Maude Metz as executrix. Maude Metz is the contestant herein.
On September 21, 1953, Metz executed a second will in the office of attorney W. C. Zeitner. This will contains substantially the same provisions as the first except for a bequest of $8,000 to Kate Smith, who is referred to as "my devoted housekeeper and companion for the last twenty-three years." This will like the first bequeathed the sum of $1 to Herman Imel "who claims to be my son". It was stipulated that proceedings for the probate of this will should "be held in abeyance until a final determination of the validity of the last will and testament of Wesley Metz, deceased, dated August 4th, 1955 is made * * *."
On November 14, 1953, Imel petitioned the County Court of Charles Mix County for letters of guardianship over the person and estate of Wesley Metz. He alleged in the petition "that the said Wesley Metz due to his advanced age and physical infirmness is incompetent and incapable of comprehending his business affairs sufficiently to properly take care of said property and business affairs, and that it is necessary, and for the benefit of and best interests of said Wesley Metz that a guardian of the person and property of said Wesley Metz be appointed * * *." The petition was opposed by Wesley Metz in person and by his attorney, W. C. Zeitner. The County Court after hearing found Metz competent and denied the petition for letters of guardianship.
Through the years Metz corresponded and frequently visited with relatives in Illinois and Pennsylvania. While visiting his grandnephew, Milton Branthaver, in September 1954 Metz asked to see an attorney. He was taken to a Mr. Smarsh in Chambersburg, Pennsylvania. Mr. Metz inquired of this attorney how a will could be drawn which would prevent Herman Imel from getting any of his estate. He was advised to employ a competent attorney in South Dakota. A few days later Metz again conferred with attorney Smarsh with reference to this same question.
On January 18, 1955, Herman Imel again petitioned the County Court of Charles Mix County for letters of guardianship over the person and estate of Wesley Metz. In such petition Imel alleged "* * * and due to his advanced age he (Wesley Metz) has reached a mental state known as senility and that due to such condition the said party is childish and incompetent to attend to his business affairs and also due to his advanced age and the condition of his mind, is both physically and mentally incapable of caring for himself and therefore requires *396 constant attention". Metz again resisted the appointment of a guardianship in person and by his attorney, W. C. Zeitner. The hearing in this matter was continued over until August 1955 at which time the County Court found testator to be incompetent and appointed Maude Metz as guardian. She did not qualify and Herman Imel was subsequently appointed guardian. Metz died before Imel qualified. No transcript was made of the proceedings in County Court. However, according to Judge Melcher, Imel testified at the hearing that a guardian was necessary for the reason "he believe(d) that Mr. Metz's property was in danger that he thought people might talk him out of it * * * that Mr. Metz was always interested in big insurance and that someone attempted to get him to sign a deed to his property under the guise of being an insurance policy." At this same hearing Imel testified he was the son of Wesley Metz. Thereupon Metz stated in open court, "that's a damn lie".
About this same period of time Metz and Imel were in the bank at Wagner, South Dakota, together. They talked to Walter Frei, the president of the bank and George S. Smith, its cashier. Mr. Frei testified with reference to this meeting as follows: "Mr. Metz came in to see me about this guardianship and spoke about it and Mr. Imel was with him. In the course of the conversation Mr. Imel made this remark he says, `he is my father but he denies it', and a short time after that the conversation ended the usual way, and as I remember, Mr. Imel got up and just as he went out and I think Mr. Imel might have heard it, I am not sure, Mr. Metz made this remark, `he claims he is my son but he is not'." George Smith, the cashier, testified that while he was waiting on Mr. Metz, Imel came over to the cashier's window and said, "I'm his son" and Mr. Metz replied, "He ain't no such damn thing."
While visiting his sister, Emma Graves, in Hanover, Illinois, in February 1955, decedent fell and broke his hip. He never walked again. He was hospitalized in Illinois for a short period and returned to South Dakota in March 1955. He returned to his farm home and was cared for by his housekeeper, Kate Smith.
Following a visit on July 12th, Imel took Metz home with him to Rapid City. He was thereafter examined and treated by several doctors. He had coronary artery disease with angina pectoris, cataract of the left eye, deafness, senile ectropion bilaterally, constipation, and was still suffering from the effects of his broken hip. He was admitted to the St. John's Hospital on August 1st, where he remained until noon on August 4th. He spent the afternoon riding around town with Imel in his pickup truck. Early that evening he executed a power of attorney which had been previously prepared by an attorney at Imel's request and direction. This power of attorney authorized Imel to withdraw all bank funds deposited in the name of Wesley Metz and to handle all business affairs for him. That same evening Metz executed the will which is contested in this proceeding. The will was previously prepared by Kelton Lynn, a competent and reputable attorney at Rapid City. Mr. Lynn was employed by Imel for this purpose. Lynn never had an opportunity to see decedent personally. Information as to the contents of the will came entirely from Imel. After the will was prepared Mr. Lynn offered to go with Imel and see that it was properly executed. Imel told Lynn he would take care of that. Two of Imel's friends acted as witnesses.
The will was executed in the presence of and under the supervision of Mr. Imel. Its provisions were contrary to prior wills. None of decedent's relatives were provided for. The bequest to Kate Smith was reduced from $8,000 to $1,000. The entire balance of the estate was bequeathed to Herman Imel, who is referred to as "my only child, Herman Imel" and as "my beloved son, Herman Imel". The will also nominated Imel as executor without bond.
Imel used the power of attorney shortly after it was executed to withdraw several *397 thousand dollars from the Delmont bank and to sell a tractor belonging to Metz. He also attempted to withdraw money on deposit in the banks at Wagner and Armour but they refused to honor the power of attorney. According to Imel this money was given to him by Metz.
On August 8, 1955, Imel's lawyer procured the signature of Wesley Metz to a petition for letters of guardianship in Pennington County requesting the appointment of Imel as guardian. This petition contained the statement that Imel was petitioner's son. Two days later Metz wrote the following letter to his cousin, Milton Branthaver: "Dear Cousin Milt: It seems that the whole gang is bound to take all my property away from me. The judges is the worst. Walter Frei, the banker and Wally Zeitner of Armour is all together to rob me. Tomorrow is the last day I can do anything. I have money in three banks. They will try to goble over $21,000 besides the Wagner bank. It is a fright. I have no friends to help me. (page two) You are too far away and got a job, you can't give up. I don't want no guardian and will have to go to circuit court. They put Maud Metz into get all her property and mine to it. Supreme Court I will go if I have to spend all my money before I have a guardian. Will I ever get to see you? I wrote you a letter yesterday and its gone. I can't hardly see to write anything. Your Cousin, W. Metz, (on the back of that sheet) If you could buy this land, would be a help. Would your boys ever want to raise cattle and livestock? I can't get to get the money out of them banks."
Because of his weakened physical and mental condition Metz was constantly under the care of doctors while in Rapid City. When he was not hospitalized, he was confined to Imel's home. While in Imel's home he was either bedridden or in a wheelchair and was dependent upon Imel for his meals and every personal need. During this period Metz had no opportunity to see persons other than those he met through Imel. On one accasion his former attorney, W. C. Zeitner, called and requested to see Metz outside Imel's presence. At Metz's direction Imel stayed during their conversation. In November Metz was hospitalized and operated on because of stomach ulcers. He died on November 17, 1955, as a result of peritonitis following the operation.
From July through October 1955 Metz wrote numerous letters to his relatives in Illinois and Pennsylvania. These letters were offered as evidence in the County Court proceedings. They disappeared from the files between the time of hearing in County Court and the time of trial in Circuit Court. It was, therefore, necessary to establish their contents by secondary proof. The letters reflect a disorientated, fearful mind. Apparently Metz was afraid of returning to Wagner because of an apprehension he might be sent to Yankton or prosecuted for perjury for denying that Imel was his son. He stated in the letters, among other things, "Imel wants me to admit I am his father, but this I will never do because the old devil will put me in the pen for life"; "Will you come out and help me?"; they "wouldn't take (me) to a lawyer and wouldn't bring any lawyer to (me)"; "Imel says he will take me back homeif I stay there they will take me to Yankton and keep me there * * * they will appoint a guardian for me and I will never get out so they can get the land unless I appoint him for guardian. I will never do that if I lose the land. * *".
There is no direct proof of undue influence in this case. There seldom is. Undue influence is not usually exercised in the open. "It is therefore usually solely through inferences drawn from surrounding facts and circumstances that a court arrives at the conclusion that a will is the product of undue influence working on the mind of the testator." Johnson v. Shaver, 41 S.D. 585, 172 N.W. 676, 678.
With reference to the essential elements of undue influence we believe the *398 trial court could reasonably find, or infer, from all the surrounding facts and circumstances that decedent, Wesley Metz, was a person susceptible to such influence. Susceptibility to influence does not mean mental or testamentary incapacity. In fact, the application of undue influence presupposes mental competency. There can be no undue influence of a person devoid of mental competency. The will, in such case, would be invalid because of incompetency. However, "physical and mental weakness is always material upon the question of undue influence". Johnson v. Shaver, 41 S.D. 585, 172 N.W. 676, 678. Obviously, an aged and infirm person with impaired mental faculties would be more susceptible to influence than a mentally alert younger person in good health.
The proponent himself furnished proof of the first element of undue influence. In seeking to be appointed guardian of decedent's person and estate, proponent alleged that "due to his advanced age he (Wesley Metz) has reached a mental state known as senility and that due to such condition the said party is childish and incompetent to attend to his business affairs". Imel further testified at the hearing in County Court that "Mr. Metz's property was in danger. That he thought people might talk him out of it".
The record further shows that on several occasions Metz denied that Herman Imel was his son and expressed his desire that Imel should not receive any of his property. The will of August 4, 1955, is contrary to all of decedent's prior wills, declarations and statements with reference to the disposition of his property. Such prior inconsistent wills, statements and declarations are competent and, in our opinion, reflect decedent's inability to resist the improper influence of Mr. Imel. Ekern v. Erickson, 37 S.D. 300, 157 N.W. 1062.
Without question Imel had the opportunity from July 12th to the date of decedent's death to exert influence upon him. During this period decedent was either at Imel's home or in hospitals at Rapid City. Metz was in strange surroundings away from his usual friends and neighbors. Imel was kind to him and took care of his every need. In the preparation and execution of various legal documents Metz never had the benefit of independent legal advice or counsel.
The trial court was justified in finding that a confidential relationship existed between Metz and Imel at the time the will was executed. It began when Imel obtained the power of attorney. It continued until testator's death. The mere existence of a confidential relationship does not give rise to a presumption of undue influence. However, such presumption arises where a confidential relationship exists between the testator and a beneficiary who actively participates in the preparation and execution of a will and unduly profits therein. Annotation 154 A.L.R. 583. Where these facts exist the transaction should be "scrutinized closely and condemned unless shown to be fair and above board." In re Daly's Estate, 59 S.D. 403, 240 N.W. 342, 343. When a confidential relationship is established the burden of "going forward with the evidence" shifts to the beneficiary to show that he took no unfair advantage of his dominant position. McKiver v. Theo. Hamm Brewing Co., 67 S.D. 613, 297 N.W. 445, 447; Davies v. Toms, 75 S.D. 273, 63 N.W.2d 406. The proponent did not sustain this burden to the satisfaction of the trial court.
Imel's disposition to unduly influence Metz for an improper purpose is clearly established. It is evident from Imel's persistent efforts to gain control and possession of testator's propertyby guardianship proceedings, power of attorney, gift, and finally by will.
The evidence also clearly reflects the effect of Imel's influence. In the light of all the surrounding facts and circumstances the contested will speaks for itself in this regard.
*399 There being no clear preponderance of evidence against the trial court's finding of undue influence probate of the contested will was properly denied.
Affirmed.
All the Judges concur.