**In the Matter of the ESTATE OF Frederick G. BORSCH, Deceased.**

**No. 14226.**

Supreme Court of South Dakota.

Considered on Briefs Jan. 20, 1984.

Decided Aug. 1, 1984.

---

A.P. Fuller of Amundson & Fuller, Lead, for Alan and Liselotta Herbert, intervenors and appellants.

Jon Mattson of Driscoll, Mattson, Rachetto & Christensen, Deadwood, for Jeraldine Fahrni, Rose Borsch, and Chester Borsch, Jr., contestants and appellees.

HENDERSON, Justice.

This is a civil appeal arising from a judgment declaring two wills invalid. We affirm.

In January of 1980, Frederick G. Borsch had written a will dividing his property among several friends and his niece, Jeraldine Fahrni. Upon being shown this will, Alan Herbert, a close friend, advised Borsch that it "won't stand up for thirty seconds." On March 20, 1981, Borsch executed another will, leaving virtually all of his property to Alan and Liselotta Herbert, intervenors-appellants. After the March will was executed, it was ascertained by Alan Herbert that paragraph III thereof was a repetition of other portions of the will, and that there were certain clerical errors in the drafting of the will. A subsequent will deleting the duplicative paragraph and correcting certain of the typographical errors was executed July 8, 1981.

Borsch died on November 2, 1981, at the age of 81 years. He left no surviving

spouse, brothers, sisters, nor did he leave any children surviving him. The nearest relatives at the time of his death were his niece, Jeraldine, and a nephew, Chester Borsch, Jr. (contestants-appellees). Petition for probate of the July 8, 1981 will was filed by the administrator named therein on December 2, 1981.

Prior to hearing on this petition, a petition contesting probate was filed on January 7, 1982. Contestants, Jeraldine Fahrni, Chester Borsch, Jr., and Rose Borsch, devisees, legatees, and heirs at law of Frederick Borsch objected to probate of the will because 1) decedent was incompetent to make a will and 2) the will was a result of undue influence upon decedent by Alan and Liselotta Herbert. On February 17, 1982, a Motion to Intervene was filed on behalf of the Herberts to protect their interest in Borsch's estate.

Judgment was rendered on April 29, 1983, declaring Borsch's July 8, 1981 will to be invalid as a result of undue influence upon decedent by the Herberts. Though never admitted to probate, the will dated March 20, 1981 was also declared invalid. This will was substantially similar to the July 8, 1981 will and was considered to stem from the same undue influence.

Intervenors-appellants request reversal of the circuit court's judgment. Several issues, raised on appeal, are: 1) Did a confidential relationship exist between Borsch and the Herberts, thereby raising a presumption of undue influence, 2) was the existence of undue influence established, and 3) did the trial court err in declaring Borsch's March 20, 1981 will invalid? The competency of Borsch was not raised on appeal.

"This Court, by statute, is bound to apply the clearly erroneous test." *In re Estate of Pierce*, 299 N.W.2d 816, 818 (S.D.1980); SDCL 15–6–52(a).

> In reviewing this matter, we must give due regard to the opportunity of the trial court to judge the credibility of the witnesses.... In addition, we must review the facts in the light most favorable to the findings of the trial court and all

conflicts in the evidence must be resolved in its favor.

*In re Estate of Jones*, 320 N.W.2d 167, 169 (S.D.1982).

"A confidential relationship exists whenever a decedent has placed trust and confidence in the integrity and fidelity of another." *In re Estate of Weickum*, 317 N.W.2d 142, 145 (S.D.1982). The mere existence of such a relationship does not automatically raise a presumption of undue influence, however, "unless the beneficiary actively participated in the preparation and execution of the will and unduly profited therein." *Id.* (citing *In re Estate of Anders*, 88 S.D. 631, 226 N.W.2d 170 (1975) and others). Further,

> [e]ven though the existence of a confidential relationship, in and of itself, does not create a presumption of undue influence, it may demand that the relationship be examined with close judicial scrutiny so as to insure that the transactions which transpired in conjunction with the confidential relationship are fair and aboveboard.

*In re Heer's Estate*, 316 N.W.2d 806, 810 (S.D.1982).

There can be no question that a confidential relationship existed between Borsch and Alan Herbert. Their friendship spanned approximately 25 years. They saw each other on a daily basis and frequently ate meals together. Borsch gave gifts to the Herberts on many occasions. Alan Herbert testified that Borsch would ask his advice on business topics and "on just about anything that came along." Others testified that Borsch consulted the Herberts on all his business and personal matters. Borsch's reliance on Alan Herbert as an advisor extended to the making of a will, under which Herberts received virtually all of Borsch's estate.

It was in January of 1981 that Borsch showed his friend a will he had written the year before and was immediately advised that it would not stand up. Alan Herbert suggested seeing an attorney. On the occasions of both the March 1981 and the

July 1981 wills, Herbert accompanied Borsch to the attorney's office. He did not sit in on the conferences concerning the will, nor was he present at the execution of either will. However, he did help Borsch prepare an inventory of his holdings which had been requested by the attorneys. Herbert also accompanied Borsch to the bank and sorted through stock certificates and other items in a safety deposit box.

· It was Herbert who gave the attorneys a small notebook containing a listing of Borsch's properties. In addition, a list of properties with the particular percentages allotted to various individuals was given to the attorneys. They testified the list was presumed to have been made by Borsch. At no time during the period from March to July, nor during deposition previous to trial, nor on being first examined at trial, did Alan Herbert mention it was his handwriting on the list. He testified he "forgot" all about it. Herbert later testified during trial that Borsch had asked him to prepare a list of mining claims and a list of division of these claims by percentage. Both lists were made at the same time and were made on Herbert's memo paper. Upon being asked why it was he had written the list, he stated Borsch "frequently asked me to do things like that for him, to write letters, make notes, whatever he happened to have that needed writing."

█ Thus, Herbert's own testimony reveals that Borsch depended on him for his help and advice. And, though it is clear he did not actively participate in drawing the will or in its execution, Herbert did guide Borsch through a great many steps in the process. "Where [such] facts exist the transaction should be 'scrutinized closely and condemned unless shown to be fair and above board.'" *In re Metz' Estate*, 78 S.D. 212, 222, 100 N.W.2d 393, 398 (1960). The trial court did not err in finding that a confidential relationship existed. Once this had been established, "the burden of 'going forward with the evidence' shifts to the beneficiary to show that he took no unfair advantage of his dominant position." *Id.*

[A] will procured by undue influence may be declared void. To establish the existence of undue influence, contestants must prove by a preponderance of the evidence four essential elements: (1) decedent's susceptibility to undue influence, (2) opportunity to exert such influence and effect the wrongful purpose, (3) a disposition to do so for an improper purpose and (4) a result showing the effects of such influence.

*In re Estate of Weickum*, 317 N.W.2d at 145.

### A) SUSCEPTIBILITY TO UNDUE INFLUENCE

█ There is substantial evidence that Borsch was mentally competent to make a will, both in March and in July. He knew the property he owned, where he wanted it to go, and the contents of his will. However, mental competence is not dispositive of this issue. "Susceptibility to influence does not mean mental or testamentary incapacity. In fact, the application of undue influence presupposes mental competency." *In re Metz' Estate*, 78 S.D. at 221, 100 N.W.2d at 398.

At the time in question, from about January 1981 to July 1981, Frederick Borsch was 81 years old. Age was beginning to take its toll. His health was failing, and he did not feel well at times. Injuries incurred in youth were beginning to show their rage. Though his physician at the V.A. Hospital felt him to be alert "considering his age," he did indicate that Borsch's physical condition had deteriorated and he noticed a bit of "euphoria," a seeming unconcern at his discomfort. Nurses at the hospital noticed that Borsch had lapses, which occurred more frequently in April than in January, when last seen. They attributed this to old age.

A cousin noticed that Borsch's physical and mental capacity had diminished somewhat. Friends of Borsch also noticed changes. He seemed "down," much more "negative" the last years. He was described as being sad and unhappy. Others testi-

fied to changes in Borsch. He was growing confused, getting older, and feeble.

"Certain it is that while mere physical weakness is not necessarily evidence of undue influence, evidence of physical and mental weakness is always material upon the question of undue influence." *Johnson v. Shaver*, 41 S.D. 585, 594, 172 N.W. 676, 678 (1919) (citations omitted). "Obviously, an aged and infirm person with impaired mental faculties would be more susceptible to influence than a mentally alert younger person in good health." *In re Metz' Estate*, 78 S.D. at 221, 100 N.W.2d at 398.

### B) OPPORTUNITY TO EXERT INFLUENCE AND EFFECT WRONGFUL PURPOSE

As indicated previously, the Herberts and Borsch shared a very close relationship. They saw each other on a daily basis. The Herberts did odd jobs for Borsch, such as mowing his lawn and driving him to town frequently. They shared meals on many occasions, occasions which Borsch feared missing because "they'll get mad at me."

It was Alan Herbert who suggested Borsch needed a new will, Herbert who drove him to the attorneys' office, Herbert who helped Borsch inventory his estate. When there proved to be a discrepancy in the March will, Alan Herbert suggested and saw to it that the will was revised. Upon being questioned as to the dispositions of these last two wills, Herbert testified that Borsch would not have included his heirs at all, had it not been for Herbert's intervention on their behalf. Certainly, the inference of Alan Herbert's influence is present.

Further, sometime in January of 1981, Borsch loaned the Herberts a substantial sum of money to pay for some surgery required by Mrs. Herbert. There is conflicting testimony as to whether Herberts asked for the money or whether Borsch offered it. At any rate, Borsch turned over 680 silver dollars, which were in turn sold by Herberts for over $10,000. This gift came at a time when Borsch hardly had sufficient funds to care for himself, as evidenced by his need to effect a loan at this time. In addition, it was determined that the Herberts had several thousand dollars in checking and savings accounts plus a coin collection valued at $15,000. After paying for the surgery, the remaining cash was placed in their personal checking account. Later, in the fall of that same year, Herberts were able to afford a trip to Europe.

### C) DISPOSITION TO DO SO FOR IMPROPER PURPOSE

"[A] disposition to unduly influence ... for an improper purpose is ... evident from ... persistent efforts to gain control and possession of testator's property ...." *In re Metz' Estate*, 78 S.D. at 222–23, 100 N.W.2d at 398. Herberts acquired their home from Borsch. They lived in it rent free from the early sixties, until 1978 when Borsch deeded the property to them. Evidence showed instances where cash gifts were made to the Herberts. Liselotta Herbert testified that she could recall no such gifts for the year 1981. Yet, there were several checks written to the Herberts during that time. In addition to these checks, checks were made out to cash and endorsed by Alan Herbert. The circumstances surrounding the silver dollars, previously discussed, infers a disposition to acquire funds from an individual unable to care for himself financially.

Finally, there is the overriding evidence of the wills. In January 1980, Frederick Borsch had a will giving most of his property to his niece, Jeraldine Fahrni. One year later, in March 1981, a new will was drafted giving virtually all of Borsch's property to the Herberts. Because of a repetition of items with regard to Chester Borsch, Jr., this will was subsequently redrafted, deleting the redundant paragraph in July 1981. The attorney who drafted both wills claims he did so based upon some writings given him by Borsch, designating percentages of property to be devised. These writings subsequently turned out to be those of Alan Herbert.

## D) RESULT SHOWING EFFECTS OF SUCH INFLUENCE

The most damaging evidence in this respect are the wills of March 20, 1981, and July 8, 1981. The July 8, 1981 will of Frederick Borsch gives his home to the Herberts. It then devises percentages of certain mining claims to Jeraldine Fahrni, Chester Borsch, Jr., and others. These percentages are very small (in the ½% to 2% range). Finally, the residue of the estate is bequeathed to the Herberts. There is testimony to the effect that Borsch wanted to provide for the Herberts. He was grateful to them for their help throughout the years, particularly when his mother was ill and needed a great deal of care. However, there is also testimony from several sources, including Jeraldine Fahrni, that from the time she was a young girl, Frederick Borsch intended his earthly goods to be Jeraldine's. There is evidence describing Borsch's affection for Jeraldine and testimony that their relationship was a close one. There is some indication that Borsch may have initially been displeased with Jeraldine's marriage in November 1980. However, he resolved his feelings on that matter and stated on several occasions how happy he was for her.

Frederick Borsch's 1980 will reflected that Jeraldine inherit his home. However, just one year later he devised virtually all of his property to the Herberts. Certainly, "[a] testator has the privilege and right to dispose of his property as he chooses within limits and in the manner fixed by statute. The law does not require that he recognize his relatives equally or at all." *In re Blake's Estate*, 81 S.D. 391, 398, 136 N.W.2d 242, 246 (1965). However, in determining if a will reflected undue influence, this Court took into account the total disinheritance of a niece and nephew in *In re Estate of Jones*, 320 N.W.2d at 170, saying:

> Jones executed a will in 1974 leaving the major portion of his estate to a niece and two nephews. His 1979 will disinherited his relatives completely and bequeathed to [another] his bank stock, cash, silver bars, and coin collection. While nieces and nephews are not considered the natural objects of the testator's bounty ... their total disinheritance just five years after the execution of the 1974 will demands close judicial scrutiny. (Citations omitted.)

There is also testimony that on June 17, 1981, after the March 20th will which effectively disinherited Jeraldine, Borsch again told a close friend "that Jeraldine was going to get the house" and that "someday it will all be Jeraldine's." "[A] [d]eclaration of testator made previous to the execution of the will, and indicating a purpose inconsistent with the provisions thereof, 'is competent and relevant, in connection with other evidence, as tending to show susceptibility to undue influence.'" *Johnson v. Shaver*, 41 S.D. at 595, 172 N.W. at 678. There was no reflection of this wish in the July 1981 will.

> There is no direct proof of undue influence .... There seldom is. Undue influence is not usually exercised in the open. "It is therefore usually solely through inferences drawn from surrounding facts and circumstances that a court arrives at the conclusion that a will is the product of undue influence working on the mind of the testator."

*In re Metz' Estate*, 78 S.D. at 221, 100 N.W.2d at 397 (citation omitted).

The establishment of a confidential relationship in which Alan Herbert had a hand in the formation of the will is clear. "The establishment of facts giving rise to the presumption also establishes a prima facie case which can sustain a finding of undue influence.... The presumption ... remains even though the beneficiary introduces evidence rebutting the presumption." *In re Estate of Nelson*, 274 N.W.2d 584, 588 (S.D.1978). The trial court did not believe the Herberts had overcome the presumption of undue influence by going forward with sufficient evidence necessary to show they did not take advantage of

Borsch to their gain. As the trial court heard the testimony and was able to view the witnesses, we must give deference to its determination. There is sufficient evidence to show by a preponderance that the wills of July 8, 1981 and March 20, 1981 were the result of undue influence.

■ Intervenors-appellants insist the trial court erred in declaring the will of March 20, 1981 invalid. The only issue raised in the pleadings was the invalidity of the July 8, 1981 will. They assert that this singular issue did not change. In actuality, however, it did. As a result of evidence presented, two wills were at issue.

The wills of March 20, 1981 and July 8, 1981 were substantially similar, with the exception of a repetitive paragraph in the first will which was deleted in the second. The issue of undue influence with regard to both wills was raised through the course of the trial. It was argued that both wills were a result of Herberts' influence. Testimony was offered from all parties on undue influence, encompassing both wills. No objections were made as to the inclusion of the March 20, 1981 will.

SDCL 15–6–15(b) provides in part: "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Amendment of the pleadings may be made at any time to conform to the evidence, even after judgment, however, "failure ... to amend does not affect the result of the trial of these issues." *Id.* "Where an issue has been tried without objection it is treated in all respects as if it had been raised in the pleadings." *Durr v. Hardesty,* 76 S.D. 232, 240, 76 N.W.2d 393, 397–98 (1956). The validity of the March 20, 1981 will was fully adjudicated at trial without objection. The trial court did not err in declaring both wills invalid.

Affirmed.

All the Justices concur.