In re the BETTY A. LUHRS TRUST.

No. 16301.

Supreme Court of South Dakota.

Considered on Briefs March 23, 1989.

Decided July 5, 1989.

Ronald C. Aho and Scott K. Bradshaw of Aho & Bradshaw, Brookings, for appellant, Betty A. Luhrs.

Michael B. Crew of Crew & Crew, Sioux Falls, for appellee, Erna A. Smith.

HENDERSON, Justice.

## PROCEDURAL HISTORY/ISSUES/HOLDING

On October 15, 1987, Petitioner/Appellant Betty A. Luhrs (Luhrs), settlor/co-trustee/beneficiary of the Betty A. Luhrs Trust, filed a petition in the circuit court for Lincoln County. The trust had been created by Luhrs on July 23, 1987, with Luhrs and her sister, Respondent/Appellee Erna A. Smith (Smith), named as co-trustees. Luhrs asked:

1) That the trust be revoked or, alternatively, that Smith be removed from co-trustee duties;

2) That Smith be required to render an accounting to the court and herself;

3) That Smith and her husband, Vernon, be "restrained from contacting, interfering [with], bothering or harassing the Petitioner in any manner whatsoever ..."; and

4) That the trust be put under the supervision of the court.

After a trial to the court, Circuit Judge Riley W. Connelly ordered that the trust be placed under judicial supervision, but otherwise rejected Luhrs' claims. This appeal followed, with Luhrs alleging that the trial court committed two reversible errors:

1) Smith should have been removed as trustee due to estrangement between the two; and

2) The trust should have been revoked as it was the product of undue influence and/or duress on Smith's part.

We affirm, upholding the trust. Our rationale follows.

## FACTS

This case cannot be understood without a detailed factual presentation.

Luhrs, who was 81 years old at the time of the hearing, lost her husband in March 1976. They had no children. Smith, 12 years younger, was named as executor of Mr. Luhrs' estate, and, after his death, took up residence in a mobile home on an acre of land she had purchased from the Luhrs earlier. She gave up employment in Montana to do so. She thereupon administered Mr. Luhrs' estate taking care of his widow also, including the cooking and driving. Smith later married and moved into her husband's home in North Dakota, in March 1983.

In addition to giving Smith and her children powers of attorney for herself, Luhrs seems to have had a very close, friendly relationship with Smith and her husband Vernen. This was reflected on Luhrs' "Thank You" card of May 29, 1986 (Respondent's Exhibit G), which contained her handwriting, reading, in part:

Dears Sis Erna & Brother Vernen[:]

... First of all thanks again for the many chores you did for me. Erna caring for me while sick Vernen for taking me everywhere needful.... Oh & the lots of house and yard work and washing windows & fixing bathroom & kitchen.... Who else would have helped me. The Good Lord does provide....

For all the loving kindness I would never have survived here. I was just too ill to keep going. Love to both, and thanks again.

Luhrs' and Smith's brother, Walter Gutzmer (Gutzmer), in contrast, began "helping" Luhrs in early 1986, by Luhrs' own testimony. An undated letter from Luhrs to Smith contained the following reference to Gutzmer:

Walt called. He wondered how I'm getting along. I told him just fine. He said, I want to help you, if you need. I said, no, you can't help. I thought you never did help me. Just makes me sad, when he brings his aggressiveness over.

## CREATION OF WILLS

Now, we shift to a discussion of wills executed by Luhrs. Luhrs provided very well for Erna and her children, Alfred M. Braun and Maxine E. Baker, in three wills executed from 1977 to 1986, while Gutzmer received far less, and was allocated only $1 in Luhrs' will dated September 27, 1978. The major property Luhrs possessed consisted of the below-described land. Basically, her three wills completed by 1984 disposed of her land in this manner:

| SE ¼ of SE ¼ | NE ¼ of NE ¼ | SE ¼ of NE ¼ |
|---|---|---|
| Section 8 | Section 17 | Section 17 |
| **1) April 6, 1977 Will:** (Smith named exec.) | | |
| To: Smith A. Braun M. Baker (equally) | A. Braun M. Baker (less 2.5 acres or $2,500 to four of Luhrs' siblings, including GUTZMER) | A. Braun M. Baker |
| **2) September 27, 1978 Will:** (Smith named exec.) | | |
| To: Smith A. Braun M. Baker (equally) | A. Braun M. Baker (less 2.5 acres or $2,500 to four of Luhrs' siblings, including SMITH, with GUTZMER to receive only $1) | A. Braun M. Baker |
| **3) December 19, 1984 Will:** (Smith named exec.) | | |
| TO: Smith (life estate) A. Braun (remainder) M. Baker (remainder) | A. Braun M. Baker (less 2.5 acres or $2,500 to four of Luhrs' siblings, including GUTZMER) | A. Braun M. Baker |

These three wills are fairly consistent: Smith and her children were to take most of the real property. Significant changes were about to occur.

In July 1987, according to Smith, Luhrs informed her that relatives had taken Luhrs to Attorney Aho's (trial counsel for Luhrs in this case) office in Brookings, while she was visiting Gutzmer at Christmas time, and that she then signed papers which she did not understand. These documents, exhibits at trial, turned out to be revocations of powers of attorney Luhrs had given to Smith and her children. There is some indication that Luhrs may also have executed a will at this time, but Luhrs refused to discuss it at trial. Smith testified that Luhrs told her that she did not know where her money was, but Luhr's conversation eventually led Smith to a money market account.

The signature card for this account (introduced at trial) evidenced the signatures of Gutzmer, Hilda Wacker (another sister), Sheri L. Gutzmer (Gutzmer's daughter), and Luhrs. Bank statements (introduced at trial) for this account portray that it was opened with a balance of $16,860 on December 23, 1986, and closed out on July 13, 1987, with a balance of $17,311. This $17,-311 was then deposited in a savings account in the names of Luhrs and Smith at the same bank, on the same day. These funds remained untouched until October 2, 1987, when Luhrs had a $5,256 money order drawn. (copy introduced at trial) This was payable to Gutzmer or his son, Kent.

### BIRTH OF THE TRUST

Smith telephoned an attorney, John D. Gubbrud, to arrange a meeting. Gubbrud did not take the call himself and did not know whether it was Smith or Luhrs who made it. Three meetings resulted, during which the Betty A. Luhrs Trust was created. Smith was present all three times, and, according to Gubbrud and Smith, participated as an interpreter, to help Luhrs understand the legal terms and concepts which Gubbrud explained. Smith and Gubbrud testified (Gubbrud did not represent Smith at trial) that Luhrs was alert and took the initiative in explaining what she wanted: An arrangement which would put a permanent end to family pressures regarding her property while protecting her assets and providing for her. Gubbrud suggested a trust, revocable only by agreement of Luhrs and another trustee. Although Smith was initially unwilling to be named co-trustee, Luhrs insisted on it, and Smith agreed. Luhrs initialed each page of the trust document, and Gubbrud made an effort to explain the revocation and property division clauses very carefully. Gubbrud, based on his experiences, recommended against life estates and cash/land options, which, he felt, could create difficulties in the future. Luhrs followed his suggestions, and the trust was born.

### SIGNIFICANCE OF TRUST

The trust provided that the corpus was to be Luhrs' real property and $22,568 was to be then deposited with First Bank of South Dakota. The co-trustees (Luhrs and Smith) were to use trust income to support Luhrs during her life and invade the corpus if Luhrs' needs required it. Upon Luhrs' death, the corpus was to be distributed thusly:

| SE ¼ SE ¼ | NE ¼ OF NE ¼ | SE ¼ OF NE ¼ |
|---|---|---|
| Section 8 | Section 17 | Section 17 |
| To: Smith | A. Braun | one-fourth shared |
| | M. Baker | by Gutzmer's children. One-fourth each to Luhrs' siblings: Gutzmer, Florence Kauffman, Hilda Wacker. |

This trust, although much more favorable to the Gutzmer faction than the earlier wills, was soon under attack, while Smith was away. On October 2, 1987, Gutzmer and son had the $5,256 money order in their hands. The next day, October 3, Smith and her husband visited Luhrs, and found Gutzmer there. Luhrs told Smith that they (Smiths) were through. An altercation ensued, provoked by either Gutzmer

calling Mr. Smith a "son of a bitch" and vociferating that he now had "so much [evidence, apparently] on" Smith, or the Smiths attacking Luhrs. Until this imbroglio, Smith did not know that Luhrs had undergone a change of heart. The final act came on October 13, 1987, when Luhrs executed a new will which she now claims truly represents what she always wanted to do. To Smith, she gives her house, one acre of land, and a piano. Smith's children expressly receive nothing. Personal property and any residue goes to Hilda Wacker, who also, for the first time, is named executrix. Thereunder, the land would be distributed as follows:

| SE ¼ of SE ¼ Section 8 | NE ¼ of NE ¼ Section 17 | SE ¼ of NE ¼ Section 17 |
|---|---|---|
| To: ¼ each to Gutzmer and his 3 children | Hilda Wacker Florence Kauffman ½ each, less Smith's acre | ¼ each to Gutzmer and his 3 children |

This will contained the following provision, wholly inconsistent with prior wills and the trust:

I hereby revoke that certain Trust Agreement dated July 23, 1987 which bears my signature. Although said Trust Agreement bears my signature, and is stated to be irrevocable, I hereby state that my signature thereto, and my signature upon a Warranty Deed bearing the same date, was the result of duress and compulsion by my sister, ERNA A. SMITH, who I believe administered some form of drug to me telling me it was a vitamin, which caused me to do something I did not want to do—which was to sign everything over to her. Every time my sister ERNA A. SMITH has visited me in recent years she has pressured me to sign over my property to her or her children, or execute Durable Powers of Attorney to her, or otherwise transfer property to her or her children contrary to the disposition that I wish to make of that property. She has treated me so terribly that I wish to have no further involvement with her, and I would dread to have her responsible for my care. I therefore direct my Executrix, or any alternate, to contest the validity of the Trust Agreement and Warranty Deed in the event I have not successfully litigated the validity of these documents prior to my death.

At trial, Luhrs told strange stories to explain this odd history:

Smith, coming home "extremely intoxicated" every weekend, routinely tried to attack her, but Smith was always too drunk to catch her;

Smith would scream every time she did not get her way.

Smith deliberately gave her pills of some unknown sort disguised as vitamin or calcium pills, especially on the day, or days, she visited Attorney Gubbrud.

Smith stole her money and had to be forced, by a sheriff, to bring it back. This was a reference to closing the Gutzmer accounts, the funds from which were immediately redeposited.

She loves Smith and her children, "but they don't love me."

Reading the transcript, reviewing the exhibits, and placing the documented events in proper sequence was the function of the trial court. It obviously held that Luhrs was completely unreliable as a witness. In contrast, the trial court evidently held that Smith was a reliable historian, who retained the desire to do what was best for Luhrs. Attorney Gubbrud and Smith totally contradict Luhrs' tale of being drugged. Gutzmer and compatriots did not testify at trial, but were physically in the courtroom.

## DECISION

### I. REPLACEMENT OF SMITH AS TRUSTEE BECAUSE OF HOSTILITY

Luhrs argues, first, that Smith had to be removed because of the estrangement that has evolved between the two of them. The authority Luhrs uses is typified

by Restatement (Second) of Trusts § 107 comment a (1959):

> The court may remove a trustee if his continuing to act as trustee would be detrimental to the interests of the beneficiary. The matter is one for the exercise of reasonable discretion by the court.

Also, *supra* § 107 comment c:

> Mere friction between the trustee and the beneficiary is not a sufficient ground for removing the trustee unless such friction interferes with the proper administration of the trust.

The interests of the remaindermen in this trust must also be safeguarded. *In re Guardianship of Brown*, 436 N.E.2d 877, 886 (Ind.App.1982). Looking at the remaindermen of this trust, and their fate if Smith is removed, or Luhrs' fate if certain relatives gain control, it appears that Luhrs is the one who, conceivably, should be removed. Smith's conduct has been to refuse to resign or to permit Luhrs to destroy the trust. According to Attorney Gubbrud and Smith's testimony, this current fracas is exactly what the trust was meant to deal with. Luhrs wanted a final solution to a tug-of-war. She deliberately put Smith in a veto position to stop adventures like the Christmas trip to Gutzmer's. The Restatement section comments specifically address detriment to the trust, and no hint of such exists in the record. Luhrs' legal argument is an assortment of "ifs" and hypothecations. "Without a demonstration that the trust corpus is in danger of dissipation, mere displeasure of a beneficiary is an insufficient reason for removing a testamentary trustee." *In re White*, 506 Pa. 218, 484 A.2d 763, 766 (1984). *See also Akin v. Dahl*, 661 S.W.2d 911, 914 (Tex. 1983):

> We note that the hostility herein was primarily created by the beneficiaries. Preservation of the trust and assurance that its purpose be served is of paramount importance in the law and this Court will not sanction the creation of

hostility by a beneficiary in order to effectuate the removal of a trustee.

*See also duPont v. Southern Nat'l Bank of Houston*, 771 F.2d 874, 885 (5th Cir. 1985). *Wolosoff v. CSI Liquidating Trust*, 205 N.J.Super. 349, 500 A.2d 1076 (1985). Where there is no present impairment of proper trust administration, as the trustor contemplated it would be carried out, the trustee will not be removed. *Copley v. Copley*, 178 Cal.Rptr. 842, 126 Cal.App.3d 248 (1981).

■ For the same reasons, Luhrs cannot argue that there was a conflict of interest in Smith's dual trustee/remainderman role. No problems have actually surfaced. The trust places a duty on the trustees to invade the corpus when Luhrs' needs required it. Gubbrud explained this potential conflict area to Luhrs. The conflict was one reason Smith was initially reluctant to become a trustee (*supra*). When the settlor of a trust has named a trustee, fully aware of possible conflicts inherent in his appointment, only rarely will the court remove the trustee, and it will never remove her for potential conflict of interest but only for demonstrated abuse of power detrimental to the trust. *Copley, id.* Similarly, the Supreme Court of Georgia reversed a lower court's removal of two remaindermen appointed co-trustees with a settlor's widow, *Lovett v. Peavy*, 253 Ga. 79, 316 S.E.2d 754 (1984). We have before us a trust created with potential conflict in mind, and if any violation of duty arises, the trust directs that the matter be pursued in court. Given the affirmative duty placed on Smith to care for Luhrs, Luhrs is again arguing "ifs." In any event, the court placed the trust under judicial supervision.

## II. UNDUE INFLUENCE/DURESS

■ Luhrs' remaining arguments * are that the trust should have been revoked

---

* The dissent posits, in its last paragraph, the propriety of a guardianship for Luhrs. A guardianship, to be imposed upon Luhrs, was not briefed nor tried below. It surfaces, for the very first time, in the dissent. Thus, it is a

gratuitous issue upon which neither party has introduced evidence, argued below or briefed at this level. "A reviewing court will not consider matters not properly before it or matters not determined by the trial court." *Schull Construc-*

because it and all its predecessors were products of undue influence or duress and did not represent her actual testamentary intent. We deem Luhrs' testamentary intent to be adequately reflected in the unbroken chain of wills which Luhrs executed over a decade. It is only Luhrs' final will that is out of character, and unnatural in these circumstances. The only hint of duress is Luhrs' bizarre drug story, which was rejected out-of-hand by the trial court. He was best able to judge the credibility and demeanor of the witness.

 Although a confidential relationship clearly existed between Luhrs and Smith, given their long-term dealings with each other, and Smith's participating to the extent of advisor in the preparation and execution of the trust, (*In re Estate of Borsch*, 353 N.W.2d 346, 351 (S.D.1984)), Luhrs must also show that Smith unduly profited therefrom to raise a presumption of undue influence. *Pope v. Brown*, 357 N.W.2d 510, 513 (S.D.1984). The testimony of Smith and Gubbrud, combined with Luhrs' lack of credibility, offset the presumption. The relative consistency of Luhrs' planning over many years likewise weakens the presumption here, where undue influence seems to arise after the trust, given the sudden total disinheritance of Smith's children. *Borsch*, 353 N.W.2d at 351; *In re Estate of Jones*, 320 N.W.2d 167, 174 (S.D.1982). Further, past help and friendship are factors weighing against any charge that the trust or wills were unnatural. *Quist v. Beto*, 81 S.D. 375, 379, 135 N.W.2d 730, 733 (1965). Smith did not unduly profit from the trust. Luhrs, by previous wills, was on record of her dispositive intentions towards Smith for a decade. These wills militate against a conclusion of undue influence or duress.

Affirmed.

WUEST, C.J., and MORGAN and MILLER, JJ., concur.

SABERS, J., dissents.

SABERS, Justice (dissenting).

I would straight out reverse and remand to the trial court for the purpose of:

1. Removing Smith as trustee because of severe, not mere, hostility between Smith and Luhrs.

2. Replacing Smith as trustee with a court appointed, neutral, objective trustee who has no conflict of interest in the use of Luhrs' property.

3. Determining whether a court appointed guardian should be named for Luhrs, and, whether all of her property should be placed in guardianship for her use, subject to court approval.

The factual reasons and authorities for the above are set forth in the majority opinion. They clearly establish numerous grounds for removing Smith as trustee,[1] even though most of the authority cited by the majority only involve challenges by beneficiaries against trustees. None involve situations like this where the grantor, who is a co-trustee and the major beneficiary, is making the challenge. In other words, this case involves more than the "mere displeasure of a beneficiary."

The one case cited by the majority that involved hostilities between co-trustees, *In re Guardianship of Brown*, 436 N.E.2d 877 (Ind.Ct.App.1982), concluded that the hostility between two related trustees warranted their removal. The court supported its decision by quoting from Bogert, *Trusts and Trustees:*

[W]here there are several trustees and the relations between them are such that they cannot co-operate in the affairs of the trust, all or one of them may be removed.

*Brown, supra* at 886 (emphasis omitted) (*quoting* Bogert, *Trusts and Trustees*

---

*tion Co. v. Koenig,* 80 S.D. 224, 229, 121 N.W.2d 559, 561 (1963).

1. *E.g., Wolosoff v. CSI Liquidating Trust*, 205 N.J.Super. 349, 500 A.2d 1076, 1083 (1985) (Removal is warranted when the hostility has "developed to the point that the confidence of the

beneficiaries [has] been destroyed and that the trustee [can] no longer work in harmony with them"); *Copley v. Copley*, 126 Cal.App.3d 248, 178 Cal.Rptr. 842 (1981) (Inevitable future conflict can justify an order of removal).

§ 527 at 91–2 (2d rev. ed. 1978)).[2] Moreover, a court need not wait to remove a trustee until after misconduct has occurred. *Wolosoff, supra.*

Although the trust may be able to continue to function or exist without the removal of Smith, can such limited functioning be considered "proper trust administration?" Since the trustees have complete discretion regarding the distribution of principal, can the trust be properly administered if the trustees are so antagonistic? Furthermore, can it be considered proper administration for a non-grantor trustee to prevent the grantor trustee from revoking the trust when a revocation clause was specifically included in the trust?[3]

If things are as bad as presented, Luhrs needs a guardian and her property needs a guardianship. No one should be forced to co-exist in the living hell that the trial court sanctioned here.

---

**2.** Bogert explains that it is immaterial who is responsible for the antagonism.

**3.** *Restatement (Second) of Trusts* § 107(a) comment b (1959) provides that one ground for removal of a trustee is an unreasonable failure to cooperate with a co-trustee. It is unreasonable for Smith to prevent Luhrs from disposing

of her property as she desires. Luhrs may have wanted to end the tug-of-war between her relatives, but there is no evidence she desired to irrevocably dispose of her estate when she created the trust. Yet, such a result is exactly what the trial court has imposed.