**In the Matter of the ESTATE
of Sidney J. SMITH.**

Nos. 17496, 17513.

Supreme Court of South Dakota.

Considered on Briefs Jan. 13, 1992.

Decided March 11, 1992.

Doyle D. Estes, Rapid City, for appellant Frank V. Simpson; Nora K. Kelley, Rapid City, on brief.

Robert A. Martin, Rapid City, for appellee Merry Lewis Lambson.

MILLER, Chief Justice.

This is an appeal from the circuit court's order admitting Sidney Smith's will dated June 20, 1988, to probate and its finding that the disputed lifetime gifts and transfers by Smith were not the result of fraud. We reverse and remand.

## FACTS

Sidney Smith died on December 4, 1988, at the age of seventy-eight. Before retiring in 1976, he worked thirty-eight years as a sanitation truck driver in Rapid City, South Dakota, where he lived with his wife Ruby. Smith and Ruby had no children. However, Ruby's son, Frank Simpson, lived with them when he was a child.

Smith and Ruby executed wills on March 30, 1976, leaving each other their entire estates with the residual bequeathed to Simpson. Ruby died on March 28, 1988. Simpson, who was living in Seattle, Washington, came home for his mother's funeral. Simpson stayed with his step-father for a week after Ruby's death and helped him get his personal affairs in order. On April 1, 1988, Smith executed a new will which was typed by Simpson. This will left everything to Simpson, except for some small cash gifts to his nieces Merry Lambson and Beverly Hendricks, and his brother-in-law, Ruben Simpson who died in 1988.

In May of 1988, Lambson moved in with Smith to care for him so he did not have to enter a nursing home. Smith's health declined steadily the last years of his life and he needed continuous oxygen due to shortness of breath. Smith was admitted to the hospital on May 22, 1988. On June 6, 1988, while still hospitalized, *Lambson drafted a power of attorney for Smith's signature* which was then notarized by Lambson's former accountant. Shortly thereafter, he was released from the hospital.

On June 20, 1988, Smith was admitted to the hospital again. On this day, he executed his final will. Lambson made all the arrangements for Smith's June 20, 1988, will. She called her former accountant who had a program on his computer for wills. Lambson and her accountant discussed the provisions of Smith's new will and at no time prior to drafting this will did the accountant talk to Smith. Lambson arranged the witnesses for the execution of the will, and she was present when Smith signed it.

The June 20, 1988, will left Lambson his car and his furniture and a life estate in his home. Upon Lambson's death, the home would go to Simpson. The rest of Smith's estate was to be divided equally between Simpson, Lambson, and Hendricks.

On June 21, 1988, Smith created a joint bank account with Lambson. The same day, Simpson arrived in Rapid City to care for Smith while Lambson went to California for surgery. On June 28, Smith, upon Simpson's recommendation, transferred $30,000 from his savings account to a two-year certificate of deposit (C.D.). Simpson recommended the C.D. because he felt the money would be more secure and would earn more interest than if it remained in a passbook savings account. The C.D. was placed in Smith's safety deposit box.

On July 6, 1988, Lambson returned to Rapid City. Shortly thereafter, Smith added Lambson's name to another savings account. On July 7, 1988, Lambson incorrectly told Smith that the above C.D. was for twenty years, not two years. Smith, then believing that Simpson had tried to take advantage of him, became very angry, cashed the C.D., and placed the money back into a savings account, which was jointly owned with Lambson. At that time, Lambson's name was also added to the safety deposit box.

On July 11, 1988, Lambson withdrew $4,000 from one of the joint bank accounts. Lambson kept $2,000 and, apparently, under Smith's direction, gave Hendricks the other $2,000.

On July 19, 1988, Smith deeded his home to Lambson. The deed was prepared by an attorney contacted by Lambson. The deed was notarized by Lambson's former accountant who had prepared the will.

On September 7, 1988, Lambson withdrew $26,050.25 from Smith's account. Of this amount, Lambson retained approximately $15,000 towards the purchase of a 1988 Bronco for herself.[1] The balance of

---

1. Lambson withdrew $26,050.25 with the use of two cashier's checks. One was for $10,000 and the other $16,050.25, which she removed from

Smith's account at Norwest by using a power of attorney. *She tried to withdraw the money with a withdrawal slip signed by Smith, but the bank*

the total $17,000 purchase price of the Bronco came from another account. On September 10, 1988, Lambson drafted a document, allegedly signed by Smith,[2] which stated that Smith loaned her $17,000, payable at $200 a month until Smith's death or until he forgave the debt.[3]

On October 2, 1988, Smith entered the hospital where he remained until October 27, 1988. During this time, Lambson took additional action concerning Smith's property. On October 13, 1988, Lambson closed out Smith's safety deposit box.[4] On October 18, 1988, Lambson, using her power of attorney, withdrew $5,000 from a joint account and gave it to Hendricks. On October 20, 1988, Lambson drafted a document for Smith's signature which gave all of Smith's money in his Black Hills Credit Union account to Lambson. The document read as follows:

> Today I have given to my niece Merry Lewis Lambson all my money in the Black Hills Credit Union in which she is also the owner of the account, as right of survivorship, the money can be withdrawn at any time, but is to be used after my death. This is so Frank Simpson cannot get it.
> /s/ Sidney Smith

The authenticity of Smith's signature on this document was also seriously disputed.

On October 27, 1988, Smith was transferred by his physicians to a nursing home. For some unexplained reason, on November 22, 1988, Lambson opened a joint checking account in her name and Smith's.

Smith died December 4, 1988. The next day, Lambson withdrew $11,300 from their joint accounts at Black Hills Credit Union for her personal use.

Lambson filed a petition for summary administration of Smith's June 20, 1988, will. Simpson filed a petition for probate of the April 1, 1988, will and his objections to the June 20, 1988, will. An independent special administrator, appointed by the trial court, notified the court on March 4, 1990, that he was unable to effect settlement of the case. After a court trial, Smith's June 20, 1988, will was admitted to probate.

The trial court entered a judgment which stated that Smith's will dated June 20, 1988, was freely, voluntarily and knowingly executed; that Smith had the requisite testamentary capacity and his will was not procured by duress, menace, fraud, and undue influence; and that the gifts made to Lambson prior to his death, including cash gifts and the deed to his home, were voluntarily made by Smith.

Simpson requests reversal of the trial court's judgment. He raises several issues: (1) Did decedent have the testamentary capacity to make a will? (2) Did decedent have a confidential relationship with Lambson? (3) Did the trial court err in not finding undue influence? (4) Did the trial court err in finding that the will, the deed to decedent's home, the creation of joint bank accounts and various gifts were not the result of fraud?

## STANDARD OF REVIEW

"This court, by statute, is bound to apply the clearly erroneous test." *Matter of Estate of Borsch*, 353 N.W.2d 346, 348 (S.D. 1984); *Matter of Estate of Burk*, 468 N.W.2d 407, 408 (S.D.1991); *Matter of Es-*

---

*would not honor it. Therefore, Lambson used her power of attorney to withdraw the funds.* The $10,000 was then deposited in a joint account at First Bank on September 14th. The First Bank account was closed on October 13, 1988, and the money was returned to Norwest.

**2.** There was some question as to whether the signatures on this document and three others were genuine.

**3.** The record reflects that on October 6, 1988, Lambson made one $200 payment to Smith.

**4.** Lambson's testimony is somewhat confusing, but, initially, she testified that when she closed Smith's safety deposit box she discovered Smith's old will of April, 1988, and at that time wrote on the will, "Null and Void this 7–20–88 by Merry Lambson Power of Attorney." Later, she testified that she saw the will on July 20, 1988, when she took some things out of Smith's safety deposit box, and that she revoked it on that date.

tate of Pierce, 299 N.W.2d 816, 818 (S.D. 1980).

> "In reviewing this matter, we must give due regard to the opportunity of the trial court to judge the credibility of the witnesses.... In addition, we must review the facts in the light most favorable to the findings of the trial court and all conflicts in the evidence must be resolved in its favor."

Borsch, 353 N.W.2d at 348 (quoting In re Estate of Jones, 320 N.W.2d 167, 169 (S.D. 1982)).

## DECISION

■■■ The trial court found that no confidential relationship existed between Lambson and Smith. "[A] confidential relationship exists whenever a decedent places trust and confidence in the integrity and fidelity of another." Matter of Estate of Till,[5] 458 N.W.2d 521, 524 (S.D.1990); Burk, 468 N.W.2d at 410.

■■■ In determining whether a confidential relationship existed between Lambson and Smith, the court must examine several factors. For example, we must look at the amount of time that the beneficiary spent with the testator; Till, supra; Borsch, supra at 348; Matter of Estate of Zech, 285 N.W.2d 236 (S.D.1979); whether the beneficiary handled many of the testator's personal or business affairs; Till, supra; Borsch, supra; Zech, supra; Pierce, 299 N.W.2d at 816; Matter of Estate of Weickum, 317 N.W.2d 142 (S.D.1982); and also whether the testator ever sought the advice of the beneficiary; Till, supra; Borsch, supra; Weickum, supra. "Although these are not the only factors that may be considered in determining if a confidential relationship exists between a testator and a beneficiary, they are nevertheless significant factors which demand consideration in the resolution of this issue." Till, 458 N.W.2d at 524.

The record reveals that there was ample evidence on each of these factors. First, Lambson and Smith were together twenty-four hours a day when he was not in the hospital (excluding the short period of time she was in California for minor surgery). He was greatly dependent upon her.

Smith also entrusted her with many of his banking affairs, which included giving her his power of attorney and making her a joint tenant on several bank accounts. He allowed her to arrange for a new will, using her former accountant. She retained a lawyer to draw the deed on his home. She participated in discussions with his doctors concerning nursing home placement, and she helped him to decide whether he should be administered life support should he succumb to his illness.

Finally, Smith on occasion accepted advice Lambson proffered. It was she who investigated and incorrectly reported to Smith that the C.D. Smith obtained at Simpson's suggestion was for twenty years rather than two. She made all of the arrangements for the creation of the new will. As noted earlier, she made several withdrawals from joint accounts and closed out Smith's safety deposit box.

Despite this record, the trial court found that no confidential relationship existed because Smith had a strong-willed, independent, and vigilant character. We disagree. The countervailing factors noted by the trial court go more to the susceptibility of the testator to undue influence than to whether there was a confidential relationship. To hold there was no confidential relationship between Smith and Lambson flies in the face of reason.

■■■ "[T]he establishment of a confidential relationship in a will contest trial is significant because *the burden of going forward with the evidence shifts to the beneficiary* ... to show she took no unfair advantage of her dominant position." Till, 458 N.W.2d at 523 (emphasis added); In re Metz' Estate, 78 S.D. 212, 222, 100 N.W.2d 393, 399 (1960). While " 'the existence of a confidential relationship, in and of itself does not create a presumption of undue influence, it may demand that the relationship be examined with close judicial scruti-

---

5. Despite Justice Sabers' "sour grapes" suggestions to the contrary, the Till holding is alive and well. The factual distinctions between this case and Till are obvious to an impartial reader.

ny so as to insure that the transactions which transpired in conjunction with the confidential relationship are fair and above board.'" *Burk,* 468 N.W.2d at 410–11 (quoting *Weickum,* 317 N.W.2d at 145).

Having erroneously found no confidential relationship, the trial court considered the issues in the wrong context. The finding of a confidential relationship shifts the burden to Lambson to show by a preponderance of the evidence that she took no unfair advantage of Smith in the creation of the will, the deed transferring decedent's home to Lambson, the joint bank accounts and the various cash gifts.

■ Further, active participation by the beneficiary in the preparation and execution of a will, "coupled with a confidential relationship between the beneficiary and the decedent, *raises a presumption of undue influence on the part of the beneficiary if she unduly profits under the will."* *Till,* 458 N.W.2d at 523 (emphasis added).

■ It is apparent from the record that Lambson actively participated in the preparation of the will: (1) she called her former accountant to prepare the will; (2) he prepared the will without speaking to Smith; (3) Lambson arranged the witnesses for the execution; and (4) she was present when Smith executed the will.

On remand, the trial court must also determine whether Lambson unduly profited under the new will.

Accordingly, we reverse and remand to the trial court with directions to reconsider its holding consistent with the foregoing.

WUEST, HENDERSON and AMUNDSON, JJ., concur.

SABERS, J., concurs specially.

SABERS, Justice (specially concurring).

I agree with the majority opinion in this case because it follows the "well-settled law ... that a confidential relationship exists whenever a decedent places trust and confidence in the integrity and fidelity of another." *Till,* 458 N.W.2d at 529 (Sabers, J., dissenting). In defense of the trial court, I can understand an over-reaction to the majority's holding in *Till,* which reversed a trial court's finding of confidential relationship despite 41 explicit findings of fact and 11 conclusions of law. *Id.* at 528. It is too late to reverse the effect of the majority's decision in *Till,* but this case goes a long way to correctly overrule the *Till* holding as precedent.